EXHIBIT A

# HONEY BAKED HAM®

## LICENSE AGREEMENT FOR STATE OF CALIFORNIA

## Table of Contents

Page

1. Defined Terms ...................................................................................................1
   (a) Proprietary Marks: .......................................................................................1
   (b) Selected Supplier(s): ....................................................................................2
   (c) HoneyBaked Outlet:......................................................................................2
   (d) Territory: .....................................................................................................2
   (e) Products: ......................................................................................................2
   (f) Business: ......................................................................................................3
   (g) Mail Order Transactions: .............................................................................3
   (h) National Website:.........................................................................................3
   (i) Non-HoneyBaked Outlets:............................................................................3
   (j) Proprietary Information: ...............................................................................3
2. License Granted and Reserved Rights ................................................................3
   (a) Exclusive Rights. ..........................................................................................3
   (b) Licensor's Reserved Rights. ..........................................................................4
3. Term....................................................................................................................4
4. Royalties and Other Fees ....................................................................................5
   (a) Royalties. ......................................................................................................5
   (b) Timing and Manner of Payment of Royalties.................................................5
   (c) New HoneyBaked Outlet Fee. .......................................................................6
5. Spec Products and Selected Suppliers .................................................................6
   (a) Spec Products. ...............................................................................................6
   (b) Selected Suppliers. ........................................................................................6
   (c) Replacement of Selected Suppliers.................................................................7
   (d) Disclaimer. ....................................................................................................7
6. Quality Control Provisions .................................................................................7
   (a) Use of Proprietary Marks...............................................................................7
   (b) Standards for Conduct of Business. ................................................................9
   (c) Sales Efforts and Advertising. .....................................................................12
7. Proprietary Information ....................................................................................14
8. Insurance ..........................................................................................................14
9. Records and Access Thereto; Inspection of Business; Audit Matters ................15
   (a) Records. .......................................................................................................15
   (b) Inspection and Audit of Books and Records.................................................15

(c) Inspection of Operations. ...........................................................15

(d) Tax Returns. ...............................................................................15

(e) Deficiencies. ...............................................................................16

10. Periodic Reports ...................................................................................16

11. Gift Cards ..............................................................................................16

12. Proprietary Marks ..................................................................................16

(a) Ownership and Protection of Proprietary Marks. ...................16

(b) Infringement. ...............................................................................17

13. Termination ............................................................................................17

(a) Termination by Licensor. ...........................................................17

(b) Termination by Licensee. ...........................................................18

(c) Licensee's Obligations on Termination. ....................................18

(d) Termination of Deep Glazed Agreement. ..................................20

14. Restrictions on Assignment and Transfer .............................................20

(a) Transfer, of License Agreement by Licensee. ...........................20

(b) Transfer of Ownership Interests. ................................................22

(c) Transfer of License Agreement by Licensor. .............................24

15. Sublicenses ............................................................................................24

(a) Sublicenses. .................................................................................24

(b) Registration and Disclosure Obligations. ..................................24

(c) Existing Sublicenses. ..................................................................25

16. General Indemnity .................................................................................26

17. Prior License Agreement .......................................................................26

18. Acknowledgements and Representations ...............................................26

19. Relationship of Parties and Liability of Licensor .................................27

20. Enforcement ...........................................................................................27

(a) Severability and Substitution of Valid Provisions. ...................27

(b) Survivability of Obligations. ......................................................28

(c) Cumulative Rights of Parties. ....................................................28

(d) Arbitration and Other Remedies. ...............................................28

(e) Governing Law. ...........................................................................29

(f) Binding Effect. ............................................................................29

(g) Construction. ...............................................................................29

|       |       |       |
|-------|-------|-------|
| (h) | Notices and Payments. | 30 |
| (i) | Fees and Expenses. | 30 |
| (j) | Communications with the Board and Licensor. | 30 |
| (k) | General Release. | 30 |
| Exhibit A | Proprietary Marks | |
| Exhibit B | Branded Products | |
| Exhibit C | Non-Branded Products | |
| Exhibit D | Current Form of Reports Required by Section 10 | |
| Exhibit E | Limited Power of Attorney | |
| Exhibit F | General Release | |

# HONEYBAKED HAM®
## LICENSE AGREEMENT FOR STATE OF CALIFORNIA

This Agreement is made and entered into this *23 rd* day of *APRIL*, 2015 (the **"Execution Date"**), by and between HBH LIMITED PARTNERSHIP, a Michigan limited partnership (**"Licensor"**) and HONEY BAKED HAM, INC., a California corporation (**"Licensee"**).

## W I T N E S S E T H

WHEREAS, Licensor owns all right, title and interest in and to the Proprietary Marks (as defined in Section 1); and

WHEREAS, utilizing Licensor's trade secret and proprietary process for producing HONEYBAKED ham, turkey, and other products, including, but not limited to, a selection process, tracking system, pickle formula, and smoke schedule, meat processing companies selected by Licensor process and sell specialty hams to Licensor's licensees which are then finished and prepared by such licensees for retail sale in accordance with Licensor's specific procedures and specifications; and

WHEREAS, Licensor has developed a method and philosophy of operation, customer service, marketing, advertising, promotion, publicity and technical knowledge in connection with the preparation, licensing, use, marketing, distribution and sale of specialty hams and other food products in connection with the license granted herein (hereinafter said uniform method and philosophy referred to as the **"System"**), such System being subject to improvement, further development and other modification by Licensor from time to time; and

WHEREAS, Licensor and Licensee entered into a License Agreement dated January 1, 1996 to use the Proprietary Marks (as defined in Section 1) in connection with the sale of HONEYBAKED hams and other specialty food products in California (the **"Prior License Agreement"**), which provided Licensee with the opportunity to enter into a successor license term under certain terms and conditions; and

WHEREAS, the parties intend to enter into a successor license term in accordance with terms and conditions of this Agreement, which will supersede the Prior License Agreement in all respects;

NOW, THEREFORE, for and in consideration of the premises and mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.      Defined Terms.  In addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings as set forth below:

(a)      Proprietary Marks:  shall mean, collectively, the trade names "The Honey Baked Ham Company" and "Honey Baked Ham Co.", the trademarks and service marks listed on Exhibit "A", and other trademarks, service marks, proprietary symbols, logos, advertising

slogans, label and wrapper designs, and trade dress specified by Licensor from time to time. Licensor may delete, add, substitute, or modify any of the Proprietary Marks upon written notice to Licensee.

(b)     Selected Supplier(s):  shall mean suppliers selected by Licensor to process and produce certain Spec Products, which include, as of the date of this Agreement: (i) for Cured Hams, John Morrell & Co., Fresh Mark, Inc., Peer Foods Groups, Inc., and Tyson Foods, Inc. and (ii) for boneless turkey breasts, Butterball, LLC.  Licensor may from time to time remove or add Selected Suppliers or designate Selected Suppliers for any Spec Products.

(c)     HoneyBaked Outlet:  shall mean any specialty retail store and/or café primarily identified by the Proprietary Marks that is operated using the System for the primary purpose of selling Finished Hams and other Branded Products.  The term "HoneyBaked Outlets" shall also include **"Temporary HoneyBaked Outlets,"** which shall be defined as seasonal kiosks that are located within malls, shopping centers, or grocery stores or seasonal leased store locations that are located in stand-alone locations or within malls or shopping centers bearing the Proprietary Marks that are operated using the System for the primary purpose of selling Branded Products.  Temporary HoneyBaked Outlets are described in greater detail in Section 6(b)(i) (Temporary HoneyBaked Outlets).

(d)     Territory:  shall mean the entire State of California.

(e)     Products:  The following are defined terms related to products:

(i)     Bone-In Ham:  shall mean any bone-in Cured Ham.

(ii)     Boneless Ham:  shall mean any boneless Cured Ham.

(iii)     Branded Products:  shall mean Spec Products and such other products as may be specified on Exhibit "B" and otherwise in writing, which must be offered only under the Proprietary Marks.  Subject to other terms in this Agreement, Branded Products that are not designated as Spec Products may be prepared in accordance with Licensee's specifications by suppliers designated by Licensee.

(iv)     Cured Hams:  shall mean specialty ham products specially selected, processed, cured and prepared by the Selected Supplier utilizing the Licensor's trade secret and proprietary process for producing hams, and sold by such Selected Supplier to Licensee.

(v)     Finished Hams:  shall mean such Cured Hams as specially sliced and glazed by Licensee as set forth in Section 6(b)(ii) of this Agreement.

(vi)     Non-Branded Products:  shall mean food products or related products sourced from a third party supplier, which use the third party's trademarks and do not use the Proprietary Marks.

(vii)     Spec Products:  shall mean Cured Hams, Finished Hams, boneless turkey breasts and other products designated by Licensor from time to time, which must be

offered only under the Proprietary Marks, prepared only in accordance with recipes and specifications designated by Licensor, and supplied only by Selected Suppliers designated by Licensor or suppliers approved by Licensor.  The current Spec Products are specified on Exhibit "B".

(f)     Business:  shall mean the business of marketing and selling Branded Products and Non-Branded Products through HoneyBaked Outlets and Mail Order Transactions.

(g)     Mail Order Transactions:  shall mean fulfillment of orders that require shipment of food to customers, including orders placed through HoneyBaked Outlets, print catalogs, or through online catalogs accessible on Internet websites associated with domain names the use of which has been approved by Licensor.

(h)     National Website:  shall mean www.honeybaked.com and any other websites using the Proprietary Marks that are established and operated by Licensor from time to time.

(i)     Non-HoneyBaked Outlets:  shall mean any third party outlet not identified by the Proprietary Marks selling food including retail stores, grocery stores, warehouse clubs, general merchandise retailers, mass market stores,  restaurants, food service businesses.

(j)     Proprietary Information:  shall mean trade secrets and other confidential information that Licensor possesses concerning the System, licenses granted by Licensor and all aspects of the operation of Licensee's business as permitted under this Agreement.  Such trade secrets and confidential information relate to and include, but are not limited to: the System; the Standards Manual; the formula, cook cycle, smoke cycle, cure, process, specifications, knowhow and method of preparation of Cured Hams, Finished Hams, Spec Products and other products; extensive knowledge concerning the HoneyBaked Outlets and the operation thereof, including sales, costs, profits, sources and suppliers, customer concepts, methods and other valuable and confidential related information; product research and market research; and any and all other information constituting a trade secret or confidential information under applicable law; provided, however, such trade secrets and confidential information do not include information that is properly obtained from sources which are publicly accessible or which are in the public domain or that are independently developed and owned by Licensee.  Licensor acknowledges that Licensee owns U.S. Patent No. 6,513,450, 6,805,747, and 7,070,824 for the automated "glazing" and processing of various products (the **"Deep Glazed Patents"**), which are not included as part of the Proprietary Information.

2.     License Granted and Reserved Rights.

(a)     Exclusive Rights.  Subject to the terms and conditions provided in this Agreement, Licensor hereby grants to Licensee the exclusive right and license to use the Proprietary Marks and the System to (i) promote and operate the HoneyBaked Outlets within the Territory, (ii) market and sell Branded Products and Non-Branded Products through HoneyBaked Outlets within the Territory to consumers for on-premises or off-premises consumption, and (iii) Mail Order Transactions, to the extent permitted by Section 6(b)(xi).

Licensee does not have the right to sell any products at wholesale with the exception of Gift Cards that may be sold within the Territory.

      (b)    <u>Licensor's Reserved Rights</u>.

      (i)    <u>Rights Retained</u>. Licensee acknowledges that, except as expressly granted in Section 2(a), Licensor retains all rights to use and license the Proprietary Marks and the System and market and sell, or authorize others to market and sell, the Branded Products outside the Territory, including, without limitation, the right to use and license the Proprietary Marks (or any other trademarks) and market and sell the Branded Products (and/or any other products) through all other channels of distribution, except through HoneyBaked Outlets in the Territory. Licensor has the right to: establish or license HoneyBaked Outlets outside of the Territory; sell, or license others to sell, Branded Products through any distribution channels to customers located outside of the Territory; authorize Mail Order Transactions to customers located outside of the Territory and to the extent permitted in Section 6(b)(xi), to customers located inside the Territory; advertise, or authorize others to advertise, Branded Products sold through HoneyBaked Outlets inside or outside the Territory; and to operate and optimize the National Website, which may be accessed by customers inside the Territory.

      (ii)    <u>Non-HoneyBaked Outlets</u>. Licensee acknowledges that Licensor may use, or authorize others to use, the Proprietary Marks and advertise, market and sell, or authorize others to advertise, market and sell, Branded Products or other products through Non-HoneyBaked Outlets to customers located in the Territory. Provided, however, that Licensor, or its designee, may offer (i) whole, half, and quarter bone-in hams bearing the Proprietary Marks, (ii) whole, half, and quarter boneless hams bearing the Proprietary Marks, and (iii) boneless turkey breasts bearing the Proprietary Marks (collectively, **"Core Branded Products"**) in the Territory through Non-HoneyBaked Outlets only if (x) these products are also being offered through Non-HoneyBaked Outlets to customers located outside the Territory in markets where other HoneyBaked Outlets are located, (y) Licensor provides advance written notice to Licensee that Licensor or its designee of the date that it will begin selling such products through Non-HoneyBaked Outlets in the Territory, and (z) the Royalty (as defined in Section 4(a) (Royalty) is reduced to 2.75% of the Gross Sales of Licensee and all sublicensees of Licensee for as long as such sales continue through Non-HoneyBaked Outlets in the Territory. Within one year from the date on which Licensor provides written notice to Licensee that it has begun to make sales of Core Branded Products through Non-HoneyBaked Outlets within the Territory, Licensee shall have the option, as its sole and exclusive remedy, to terminate the Agreement without penalty by providing Licensor with written notice of its intent to terminate, which shall be effective sixty (60) days after Licensee delivers such notice to Licensor. Licensee acknowledges that Licensee does not have a right or license to sell any products through Non-HoneyBaked Outlets, except for sales made through Temporary HoneyBaked Outlets located within grocery stores operated by third parties as specified in Section 6(b)(i) (Temporary HoneyBaked Outlets).

      3.    <u>Term</u>. The term of this Agreement shall commence on July 1, 2015 (the **"Effective Date"**) and shall continue until June 30, 2036, unless terminated earlier in accordance with the terms of this Agreement (the **"Term"**). Commencing on July 1, 2034, the parties shall negotiate the terms and conditions for a renewal Agreement; provided that Licensee is then in compliance with the requirements of this Agreement (and continues to be in compliance with

such terms throughout the period of negotiation, at the time of signing the renewal Agreement, and upon commencement of the renewal term); and provided, further, that the parties shall execute such mutually agreed upon renewal Agreement no later than June 30, 2035. The term of the renewal Agreement shall begin on July 1, 2036. If the Licensor and Licensee have not executed a renewal Agreement on or before June 30, 2035, the parties mutually agree that any right to renew this Agreement shall then expire, and Licensee shall have no further right to renew this Agreement.

      4.    <u>Royalties and Other Fees</u>.

      (a)    <u>Royalties</u>. Licensee shall pay to Licensor a royalty at the time and in the manner set forth in Section (b) below, equal to three percent (3%) of the Gross Sales of Licensee and all sublicensees of Licensee (the **"Royalty"**). **"Gross Sales"** means and includes the total revenues derived by Licensee, and sublicensees of Licensee, respectively, from all sales (including sales through HoneyBaked Outlets and Mail Order Transactions) of all products (whether or not such products contain the Proprietary Marks), without reserve or deduction for inability to collect any such sales, but less (i) sales, use, or service taxes collected and paid to appropriate taxing authorities, and (ii) refunds or credits to customers made in good faith.

      (b)    <u>Timing and Manner of Payment of Royalties</u>. Licensee shall pay the Royalty in the following manner:

      (i)    On or before the 15th day of each month, Licensee shall pay to Licensor an amount equal to (i) One Dollar and Forty-Seven Cents ($1.47), as increased pursuant to Section 4(b)(ii) hereof, per Bone-in Ham purchased by Licensee and/or any of its sublicensees during the previous calendar month (**"Bone-in Ham Royalty"**) plus (ii) Thirty Eight Cents ($.38), as increased pursuant to Section 4(b)(iii), per Boneless Ham purchased by Licensee and/or any of its sublicensees during the previous calendar month (**"Boneless Ham Royalty"**). The Bone-In Ham Royalty and Boneless Ham Royalty shall collectively be referred to as the **"Ham Royalty"**.

      (ii)    The Bone-in Ham Royalty shall be adjusted annually on July 1 (**"Bone-in Ham Adjustment Date"**) to reflect the increase or decrease in the Consumer Price Index For All Urban Consumers for the Los Angeles – Riverside – Orange County Metropolitan Areas - All items (1982-84=100), as compiled by the U.S. Department of Labor, Bureau of Labor Statistics (the **"CPI-LA"**), using June 2014 as the base index. In June 2014, the CPI-LA was 243.528. The Bone-in Ham Royalty for each year (from July to June) shall be equal to $1.47 multiplied by a fraction, the numerator of which shall be the greater of (i) the CPI-LA published for the June immediately preceding the Bone-in Ham Adjustment Date or (ii) the CPI-LA for June 2014 (243.528) and the denominator of which shall be the CPI-LA for June 2014 (243.528). The Bone-In Ham Royalty shall be increased or decreased to the nearest ½ of one cent. Licensee shall make the calculation in accordance with this paragraph and promptly send written notice thereof to Licensor.

      (iii)    The Boneless Ham Royalty shall be adjusted annually on January 1 (**"Boneless Ham Adjustment Date"**) to reflect the increase or decrease in the Consumer Price Index For All Urban Consumers U.S. City Average - All items (1982-84=100), as compiled by

the U.S. Department of Labor, Bureau of Labor Statistics (the **"CPI"**), using November 2010 as the base index. In November 2010, the CPI was 218.803. The Boneless Ham Royalty for each year (from January to December) shall be equal to $0.38 multiplied by a fraction, the numerator of which shall be the greater of (i) the CPI published for the November immediately preceding the Boneless Ham Adjustment Date or (ii) the CPI for November 2010 (218.803) and the denominator of which shall be the CPI for November 2010 (218.803). The Boneless Ham Royalty shall be increased or decreased to the nearest ½ of one cent. Licensee shall make the calculation in accordance with this paragraph and promptly send written notice thereof to Licensor.

        (iv)    In no event shall the Ham Royalty, for any yearly period, exceed the total Royalty. On November 30 of each year, Licensee shall pay to Licensor the difference between the total Ham Royalty actually paid to Licensor for the previous July 1 to June 30 and the Royalty owed for such period (as calculated in Section (a) above).

        (c)    <u>New HoneyBaked Outlet Fee</u>. Licensee must pay to Licensor a fee of Five Thousand Dollars ($5,000.00) for each HoneyBaked Outlet of Licensee or any of its sublicensees to be opened subsequent to the Effective Date. No new HoneyBaked Outlet fee is due for (i) Temporary HoneyBaked Outlets (as defined in Section 6(b)(i)) or (ii) for the relocation of an existing HoneyBaked Outlet to another location within 3 miles of the original location within 30 days of the closing of the original location.

    5.    <u>Spec Products and Selected Suppliers</u>.

        (a)    <u>Spec Products</u>. Licensor may, in its sole discretion, designate certain products as Spec Products, which must be produced in strict accordance with Licensor's proprietary specifications and standards. Licensor will not designate a product as a Spec Product without first conducting such research as Licensor deems necessary and sufficient. If Licensor designates a product as a Spec Product, within forty-five (45) days after receiving written notice from Licensor that 51% or more of all HoneyBaked Outlets have been carrying the Spec Product for at least six months, Licensee must discontinue ordering any product replaced by the Spec Product, or if the Spec Product is a new product, make arrangements to begin carrying the Spec Product. In the event Licensee is obligated to cease selling a product, Licensee may sell out all inventory and committed inventory provided that its replacement is not due to health or safety issues (in which case Licensee must immediately cease selling such replaced product).

        (b)    <u>Selected Suppliers</u>. Licensor has made available to the current Selected Suppliers its trade secret and proprietary process and specifications for processing and producing Spec Products. Licensor may, in its sole discretion, (i) require Licensee to purchase Spec Products from designated Selected Suppliers upon such terms and conditions as may be agreed upon by Licensee and the Selected Supplier or (ii) allow Licensee to arrange for a supplier approved by Licensor in accordance with Section 6(b)(viii) to produce the Spec Products in accordance with Licensor's specifications. Licensor shall have the right to approve any agreements with suppliers to produce Spec Products so as to insure that the Spec Products are processed and prepared in accordance with Licensor's specifications and that other quality control aspects are satisfied. Any supply agreements that Licensee enters into with a Selected Supplier must terminate automatically if the agreement between the Licensor and the Selected

Supplier terminates.  Licensee acknowledges and agrees that it shall not cause or knowingly permit a supplier to change or alter the pickle formula, curing process, smoking process, cooking process, specifications, or other processing techniques specified by Licensor relating to Spec Products.

(c)     Replacement of Selected Suppliers.  If a Selected Supplier fails or refuses to produce Spec Products in a manner which meets Licensor's quality and preparation specifications or otherwise fails to meet Licensor's requirements, as determined by Licensor in its sole discretion, Licensor shall diligently endeavor to arrange for a replacement Selected Supplier for the Spec Products.  In such event, Licensor shall consider any qualified meat processor recommended by Licensee to serve as Selected Supplier for the Spec Products, so long as such meat processor and its product satisfies the quality standards specified by Licensor.  In addition, Licensee acknowledges that Licensor may, from time to time, and at Licensor's discretion, change the designation of the Selected Supplier and that all provisions in this Agreement related to the Selected Suppliers shall be fully applicable to any new or different Selected Supplier.

(d)     Disclaimer.  Licensor is not engaged in the business of preparing hams, turkeys, or other products for resale to its licensees.  BECAUSE LICENSOR DOES NOT MANUFACTURE OR SELL HAMS, TURKEYS, OR OTHER PRODUCTS, LICENSOR DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE SPEC PRODUCTS OR OTHER PRODUCTS, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND NO AFFIRMATION OF LICENSOR, BY WORDS OR ACTION, SHALL CONSTITUTE SUCH A WARRANTY.  LICENSOR SHALL NOT BE LIABLE TO LICENSEE OR OTHERS FOR ANY DAMAGES RESULTING IN ANY WAY FROM ITS SELECTION OF SELECTED SUPPLIERS, ITS REQUIRED SPECIFICATIONS, OR THE SPEC PRODUCTS OR OTHER PRODUCTS INCLUDING, BUT NOT LIMITED TO, GENERAL, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES.

6.     Quality Control Provisions.

(a)     Use of Proprietary Marks.  Except as set forth in this Section 6(a), Licensee shall not use or employ the Proprietary Marks in any manner for any purpose.  Any use or employment of the Proprietary Marks not authorized by this Section 6(a) shall be a material breach of this Agreement.  All usage of the Proprietary Marks by Licensee shall be accompanied by all required trademark, service mark, or other notices and designations as may be specified by Licensor.  Notwithstanding anything herein to the contrary, Licensee may continue to use the corporate name "Honey Baked Ham, Inc." during the Term.

(i)     Branded Products.  Licensee shall promote, advertise, market and sell all Branded Products only by using the Proprietary Marks in the manner designated from time to time by Licensor and no other words, symbols, insignias, slogans, designs logos or other identifying marks shall be used on such products.  The Proprietary Marks shall not be utilized on any other products except the Branded Products, unless Licensee obtains Licensor's prior written approval, which Licensor may withhold in its sole discretion.  Licensee acknowledges that the Branded Products may be modified from time to time (i.e., products may be added or deleted) all

at the sole discretion of Licensor. In making any decision concerning the modification of Branded Products (the addition or deletion of products), Licensor will make its determination (in its sole discretion) in a manner as to preserve and enhance the System (and its uniformity) and the quality and national reputation of the goods and services sold at HoneyBaked Outlets under the Proprietary Marks; provided, however, that Licensor shall inform the Licensee of the reasons for a deletion of any Branded Product that, as of the date of this Agreement, is set forth on Exhibit "B".

(ii)     Signage. HoneyBaked Outlets shall be identified by prominent and tasteful signs containing only one or more of the Proprietary Marks and no other words, symbols, insignias, slogans, designs, logos or other identifying marks; the manner and form of such Proprietary Marks shall be designated from time to time by Licensor and Licensee shall pay any and all costs related thereto for signage or similar changes (including, but not limited to, costs relating to the use of new Proprietary Marks implemented by Licensor). Licensee shall update its signage on all of its HoneyBaked Outlets, and shall cause its sublicensees to update their signage on all of their HoneyBaked Outlets, to match Licensor's current standards for signage (those in effect as of the Effective Date) within 180 days after the Effective Date. With respect to any changes made by Licensor to its standards for signage after the Effective Date, Licensee shall immediately comply with any such changes for any new HoneyBaked Outlets and shall make changes to HoneyBaked Outlets that are then in operation, at the earlier of: (A) the time at which Licensee replaces, refurbishes or otherwise changes existing signage for such HoneyBaked Outlets in the normal course of business; or (B) within one (1) year after such changes have been made by 35% of the HoneyBaked Outlets located outside of the Territory (**"Minimum Outlets"**); provided that in no event shall Licensee be required to implement the changes to HoneyBaked Outlets earlier than two (2) years from the time that Licensor first required that the changes be made to any HoneyBaked Outlets located outside of the Territory.

(iii)     Use in HoneyBaked Outlets. Licensee shall also prominently display at or within each HoneyBaked Outlet only the Proprietary Marks and other words, symbols, insignias, slogans, designs, logos or identifying marks as approved and designated from time to time by Licensor, and Licensee shall not place or use at or within any HoneyBaked Outlets any other signs, posters, words, symbols, slogans, designs, logos or other identifying marks which conflict with or detract from the Proprietary Marks or which would tend to confuse the public. Licensee must promptly report to Licensor in writing the opening and closing of any HoneyBaked Outlets, including the address, the name of the sublicensee (if any), and any other information that Licensor shall reasonably require.

(iv)     Use of Proprietary Marks Pursuant to the Standards Manual. In order to establish and maintain the System, Licensor may develop, approve and issue one or more confidential standards manuals (the **"Standards Manual"**). Any and all specifications, standards, policy statements, rules or any other requirements in such Standards Manual shall constitute provisions of this Agreement as if fully set forth herein; provided, however, that such Standards Manual shall not be inconsistent with the provisions of this Agreement and in all circumstances this Agreement shall be controlling. Licensee shall use and employ the Proprietary Marks as authorized and directed by such Standards Manual and Licensee shall fully comply with all provisions of such Standards Manual and any additions, deletions, revisions or modifications thereto as Licensor may deem reasonable or necessary from time to time.

Licensee will maintain the strict confidentiality of the Standards Manual and will not at any time disclose any information contained in the Standards Manual or permit access to the Standards Manual, except as may be required to Licensee's employees, provided that such employees have signed the confidentiality and non-disclosure agreement as set forth in Section 7 below. Licensee acknowledges that the Standards Manual is and shall remain the property of Licensor, and Licensee shall promptly return the Standards Manual to Licensor upon termination (prior to the end of or upon the expiration of the Term) of this Agreement. Licensor shall keep a master copy of the Standards Manual and in the event of a dispute regarding the contents of any Standards Manual, the master copy of the Standards Manual maintained by Licensor shall control.

(v)     Use of Proprietary Marks for Display and Sales Materials. Licensee agrees to utilize the Proprietary Marks in connection with display racks, packaging materials, sales aids, decorating materials and such other similar items in conformance with the Standards Manual.

(b)     Standards for Conduct of Business. Licensee recognizes that the Business to be operated by it will be part of a nationwide network of specialty food stores and businesses operated under licenses granted by Licensor or its licensees, engaging in the sale under the Proprietary Marks of Branded Products and other specialty food items and related services pursuant to the System developed by Licensor. In order to maintain such System and in order to protect and enhance the reputation, value and goodwill of the Proprietary Marks and Licensor's licensing System, and to control the nature and quality of the goods and services provided under the Proprietary Marks, so that the public may rely upon the Proprietary Marks as identifying Branded Products and other goods and services of the highest order, Licensee agrees to abide by and conform to the standards of Licensor (and such standards as Licensor may formulate from time to time to enhance the quality and national reputation of the System and the goods and services sold under the Proprietary Marks), including, but not limited to, the standards set forth in this Section 6(b). Licensee agrees that all products will be marketed to the public as high-end, premium products in order to protect and enhance the image and goodwill of the Proprietary Marks and the System. Licensee shall make its best effort to carry in stock at the HoneyBaked Outlets an adequate quantity of Spec Products and other products offered for sale to satisfy any reasonable demand for same, taking into account seasonal fluctuations.

(i)     Temporary HoneyBaked Outlets. Licensee may sell Branded Products and Non-Branded Products in Temporary HoneyBaked Outlets, provided, however, that Temporary HoneyBaked Outlets (i) may only be established after Licensor approves the location and design of the Temporary HoneyBaked Outlet in writing, (ii) may only be operated for the sole purpose of selling products in such manner as is otherwise required under this Agreement, (iii) may only be operated during holiday seasons, (iv) must be staffed by trained personnel wearing uniforms bearing the Proprietary Marks, and (v) may only be located within grocery stores operated by third parties if such Temporary HoneyBaked Outlets are directly operated and managed by Licensee's employees and are directly supplied by Licensee. Licensee shall submit information concerning the proposed location, design, and operation of a Temporary HoneyBaked Outlet prior to signing any leases or other agreements related to the Temporary HoneyBaked Outlet. For purposes of this Agreement, Temporary HoneyBaked Outlets shall be considered to be HoneyBaked Outlets, except Temporary HoneyBaked Outlets are exempt from

the square footage requirements and the layout and decor requirements related to square footage set forth in Section 6(b)(v) and are not subject to the new HoneyBaked Outlet fee set forth in Section 4(c). Licensee must promptly report to Licensor in writing the opening and closing of any Temporary HoneyBaked Outlets.

(ii)     Maintenance of Safety and Quality.  The Business, including all HoneyBaked Outlets, shall be maintained at all times in a clean, safe and sanitary condition, and shall at all times comply with all applicable federal, state and local laws, ordinances and regulations.  Licensee shall maintain properly refrigerated storage facilities at the HoneyBaked Outlets for all perishable product offered for sale.  Licensee shall take all reasonable precautions to ensure that Branded Products and other products offered for sale retain for as long as possible their original flavor, taste, consistency, freshness and other quality attributes.  Licensor has the right, in its sole discretion, to determine, approve and supervise the quality of service, the food products and ingredients used by Licensee and the method of preparation of all products sold from the Business and to take all other action, of whatever kind or nature, it deems necessary or appropriate to maintain the quality and standards of the Branded Products, the Business, and the HoneyBaked system.   If Licensor establishes food safety guidelines or requires all of its licensees to implement internal or external food safety audits or procedures, Licensee shall, at a minimum, follow such guidelines and implement such audits or procedures in all aspects of its Business, at Licensee's expense.

(iii)     Finished Hams.  Licensee shall spiral slice, glaze and otherwise finish the Cured Hams to produce Finished Hams that meet the Licensor's specifications. Licensor acknowledges that the automatic glazing of hams using an automatic glazing machine is currently an approved method, subject to Licensor's right to change methods and specifications.

(iv)     Landlord's Acknowledgement.  Licensee agrees to use its best efforts to cause a provision substantially in the following form to be included in each new lease (and each existing lease which is modified or renewed by Licensee subsequent to the date hereof) entered into by Licensee:

> "Landlord acknowledges and agrees that, upon receipt by Landlord of notice from HBH Limited Partnership ("HBH") that Tenant's License Agreement with HBH has been terminated pursuant to a determination by a court, arbitrator or other forum of competent jurisdiction, and that Tenant has transferred and assigned its rights pursuant to this Lease to HBH, or if HBH and Tenant jointly advise Landlord that Tenant has transferred and assigned its rights pursuant to this Lease to HBH, Landlord shall consent to such transfer and assignment upon HBH's assumption of Tenant's liabilities pursuant to the Lease together with payment of any and all amounts which may be outstanding and owing to Landlord at such time pursuant to the Lease."

(v)     Layout and Decor of HoneyBaked Outlets.  Each HoneyBaked Outlet, except Temporary HoneyBaked Outlets, shall have at least eighteen hundred (1,800)

square feet of usable floor space.  Licensee shall notify Licensor in writing of the location of each HoneyBaked Outlet and promptly provide Licensor with a copy of the lease for all HoneyBaked Outlets, and copies of any amendments or addenda to such leases.  From time to time, Licensee shall make such repairs and changes to each HoneyBaked Outlet as Licensor may reasonably request in writing in order to maintain and upgrade the image of the HoneyBaked Outlets.  If the location of any HoneyBaked Outlet or the ownership of any HoneyBaked Outlets changes, Licensee shall promptly notify Licensor and provide Licensor with any information about the change that Licensor reasonably requests.

(vi)    Alterations.  Licensee shall not make material alterations to a HoneyBaked Outlet, including alterations to the decor of a HoneyBaked Outlet, without providing at least thirty (30) days' notice to Licensor setting forth all relevant information concerning the proposed alterations and if Licensor does not object within such thirty (30) day period, such alterations shall be deemed approved by Licensor.  Licensor will not be required, under any circumstances, to approve of an alteration to a HoneyBaked Outlet which materially deviates from the decor or standards existing on the date of this Agreement.  Further, provided that Minimum Outlets have complied, Licensee shall make such additions, improvements and alterations to each HoneyBaked Outlet as Licensor may request in writing in order to maintain and upgrade the image of the HoneyBaked Outlets and maintain an appearance of national identity among HoneyBaked Outlets.  Such alterations shall be made by Licensee within one (1) year following the date on which the Minimum Outlets have complied; provided, however, that in no event shall Licensee be required to implement such alterations earlier than two (2) years from the time that Licensor first required that the alterations be made to any HoneyBaked Outlets located outside of the Territory.

(vii)    Non-Branded Products.  In addition to the Branded Products, Licensee may also sell in the Business Non-Branded Products, provided that such products may not be meat entrees and may not contain protein as a primary ingredient.  Licensee must provide Licensor with a list of all Non-Branded Products offered in its Business at least sixty (60) days prior to Easter and sixty (60) days prior to Thanksgiving.  Licensor may prohibit Licensee from selling any such Non-Branded Product, if Licensor determines in its sole discretion that such prohibition is necessary to preserve and enhance the System (and its uniformity) for the benefit of all licensees and the quality and national reputation of the goods and services sold and the Proprietary Marks.  If Licensee receives written notice from Licensor that it may not sell a Non-Branded Product, Licensee may continue to sell the product or the products from the supplier only from existing inventories and shall not reorder the product following Licensor's written notice of disapproval, provided that the revocation is not due to health or safety issues (in which case Licensee must immediately cease selling such products).   Licensee is currently authorized to sell only those Non-Branded Products that are set forth on Exhibit "C".

(viii)    New Products or Suppliers.  If Licensee would like to propose a new product to be offered in the Business as a Branded Product or a new supplier to supply a Branded Product, Licensee must provide Licensor with any information that Licensor requests, including samples.  Licensor has the right, but no obligation, to inspect and subsequently re-inspect the proposed supplier's facilities and to test additional samples of the proposed products at any time.  Licensor will notify Licensee in writing of its decision as soon as practicable following its evaluation.  If Licensor does not affirmatively grant approval of the proposed

product or supplier in writing, Licensee may not offer the proposed product or use the proposed supplier. Licensor has the right to grant, deny, or revoke approval of a product or a supplier, in its sole discretion, for any· reason. If Licensor revokes approval of a previously-approved product or supplier, Licensee may continue to sell the product or the products from the supplier only from existing inventories for up to thirty (30) days following Licensor's written notice of disapproval, provided that the revocation is not due to health or safety issues.

(ix)    Assignment of Rights. If Licensor permits Licensee to offer a new product that Licensee has developed, upon Licensor's written request, Licensee, as assignor, shall execute and deliver an Assignment of Recipes and/or an Assignment of Trademarks in a form designated by Licensor, conveying to Licensor, all rights, title, and interests in and to the specifications and recipes developed by Licensee related to such new product. If such an assignment occurs, Licensor shall pay Licensee its reasonable research and development costs related to the development of the product, excluding related administrative costs and overhead incurred by Licensee (such as the salaries or wages for Licensee's personnel who devote time to the development of the product). In addition, if such an assignment occurs, the recipes and specifications shall be considered to be Licensor's Proprietary Information.

(x)    Management and Business Practice of HoneyBaked Outlets. The operations of Licensee shall be conducted under the supervision and management of adequately trained persons and Licensee shall provide properly trained staff personnel for the operation and maintenance of each HoneyBaked Outlet.

(xi)    Mail Order Transactions. Licensee may sell Branded Products and Non-Branded Products in the Territory through Mail Order Transactions provided all of the following conditions are satisfied: (i) all shipments are made in full compliance with all applicable state and federal laws and regulations; (ii) Licensee uses appropriate packaging and shipping materials and techniques so as to preserve the freshness and other quality characteristics of the product; and (iii) Licensee does not advertise outside of the Territory or in any other way solicit orders for products to be delivered to points outside of the Territory except by sending "mailers" or e-mails to Licensee's existing customers. Licensee may not ship products through Mail Order Transactions to customers located outside of the Territory, except in response to unsolicited orders from consumers or orders placed by existing customers. Licensee acknowledges that Licensor must administer an orderly system for Mail Order Transactions for the benefit of the entire HoneyBaked system, that Licensor reserves the right to establish a system for doing so including, without limitation, the right to establish a mail order house, and that the restrictions on Licensee set forth in this paragraph are a reasonable means to do so, provided that the system shall not undermine Licensee's fundamental right to engage in Mail Order Transactions, as defined herein. Licensee shall also be able to properly service its customers by providing appropriate literature enclosed with the products properly shipped hereunder. Licensee agrees, if it chooses to participate, to (i) comply with any  operational structure or procedure for Mail Order Transactions on a nationwide basis that is developed by Licensor, and (ii) if directed by Licensor, include within the shipment of all Mail Order Transactions a list of information specified by Licensor including, but not limited to, a listing of all stores or places of business operating under licenses granted by Licensor.

(c)    Sales Efforts and Advertising.

(i)     Licensee shall use its best efforts to promote the sale of Branded Products in the Territory and shall advertise in the Territory in such media as will acquaint prospective consumers with the Branded Products; during the Term and any extension hereof, Licensee shall not engage in any retail food sales business that principally involves the offer or sale of ham or turkey products or the offer or sale of products sold in a HoneyBaked Outlet, except as specifically permitted and authorized herein.  The promotional and sales solicitation efforts of Licensee shall be of the highest quality and in the best interests of both Licensor and Licensee, and Licensee shall not cause the Branded Products or any other products sold by Licensee to be misrepresented in any way.  Licensee acknowledges that Licensor, in its reasonable discretion, may require Licensee to cease, alter or otherwise modify any such advertising, promotional or sales solicitation if the Licensor reasonably believes that such advertising, promotional or sales solicitation adversely affects the image of the System or the Proprietary Marks.

(ii)     Licensee shall participate in any advertising campaigns established by Licensor on a nationwide basis if the HoneyBaked Outlets subject to this Agreement offer for sale the products that are the subject of such advertising campaign and shall promptly reimburse Licensor its pro rata share for any advertising materials provided to Licensee in connection therewith in an amount equal to Licensor's costs for such materials upon receipt of a statement from Licensor.  Licensor may require annual or monthly contributions (the **"Required Contributions"**) by each licensee to a fund (the **"National Advertising Fund"**) to be used by Licensor for national advertising; provided, however, that the aggregate amount of Licensee's required contributions for any calendar year may not exceed, unless Licensee otherwise consents in writing, a sum equal to one-half of one percent (.5%) of Licensee's Gross Sales for such year.  The National Advertising Fund shall be used for national advertising including, without limitation, the purchase of space or time and the production of national advertising in print, radio and television media.

(iii)     Licensee agrees that any advertising or marketing that it conducts via the Internet shall be made in accordance with any policies that Licensor shall designate from time to time.

(iv)     Licensor shall operate and maintain a National Website to promote the Branded Products and the Proprietary Marks, which may include information about Licensee's HoneyBaked Outlets.  Licensee may operate and maintain a website for its Business using the Proprietary Marks only at a domain name approved in writing by Licensor. Licensee may not register or use domain names, establish or use social media accounts, or create or use apps for its Business without the prior written consent of Licensor, which shall have the right to require such domain names and accounts to be registered in Licensor's name.  Licensee must fully comply with any specifications, standards, policy statements, rules or any other requirements specified by Licensor from time to time related to the use of the Proprietary Marks on the Internet and/or any operations of the Business on the Internet, provided that all of Licensor's licensees are subject to such requirements.

(v)     Licensor must provide Licensee with notice of any planned national advertising programs or promotions at least ninety (90) days prior to the launch date of such program or promotion, but Licensor shall not be required to provide Licensee with all of the

details of such program or promotion until they are finalized, which may occur any time prior to the launch date of such program or promotion. ·Licensee acknowledges that unplanned marketing opportunities may arise that require less than ninety (90) days' notice, which Licensee shall be required to participate in, provided that at least 45% of all HoneyBaked Outlets are participating in such program or promotion. If an unplanned national marketing opportunity arises, Licensor shall notify Licensee of the marketing opportunity within ten (10) days of Licensor identifying such potential opportunity or as soon as is reasonably possible, if the promotion or program will begin in less than ten (10) days from the date the opportunity arises.

      7.    <u>Proprietary Information</u>.

      (a)    Licensee acknowledges that Licensee has obtained from Licensor, and will continue to obtain from Licensor throughout the Term, Proprietary Information and that such information is material to the effective and successful conduct of the System and Licensor's business. Licensee covenants and warrants that it will not, and that it will use its best efforts to cause its employees and agents not to, at any time, whether during or subsequent to the Term of this Agreement, divulge, disclose or communicate to any third party or make any unauthorized use of, whether directly or indirectly, any Proprietary Information without the prior written consent of Licensor. Licensee shall cause all of its officers, directors, managers, and employees to execute a confidentiality and non-disclosure agreement in a form satisfactory to Licensor. Licensee shall promptly deliver the executed confidentiality and non-disclosure agreements for its officers and directors to Licensor. Each unauthorized disclosure, communication, duplication or use of Proprietary Information shall constitute: (i) an undertaking by Licensee and the actual person making such disclosure, communication, duplication or use, and Licensee and such person shall be liable, jointly (if Licensee has breached its best efforts undertaking) and severally, for general damages with respect to such unauthorized disclosure, communication, duplication or use, and (ii) an unfair method of competition and a material breach of this Agreement, and Licensor shall be entitled to injunctive relief prohibiting such disclosure, communication, duplication or use.

      (b)    Licensee shall acquire no interest in Proprietary Information, other than the right to use Proprietary Information as permitted herein during the Term and in accordance with the provisions of this Agreement. Licensee acknowledges that Licensor grants the rights to Licensee herein in part in consideration of, and in reliance upon, Licensee's agreement to deal exclusively with Licensor, and that Licensor has the right to protect such Proprietary Information against unauthorized disclosure, communication, duplication or use.

      (c)    Licensee shall cause its sublicensees to make acknowledgements, covenants, agreements and commitments corresponding to the foregoing, all in the form required by Licensor.

      8.    <u>Insurance</u>.

      (a)    Licensee shall at all times during the Term and any extension of this Agreement carry commercial general liability insurance coverage with a combined single limit (bodily injury and property damage) of Five Million Dollars ($5,000,000) per occurrence; Five Million Dollars ($5,000,000) personal and advertising injury; Five Million Dollars ($5,000,000)

products completed operations liability aggregate and Five Million Dollars ($5,000,000) general aggregate. In addition, Licensee shall carry adequate Worker's Compensation insurance as required by the laws of California.

(b)     Licensor shall be named as an "Additional Insured" under all policies for such insurance. Licensee shall furnish Certificates of Insurance providing for the above-described coverage issued by a responsible insurance company or companies, approved in writing by Licensor, to Licensor promptly after the execution of this Agreement. Such certificates shall state that the policy or policies will not be cancelled or altered unless Licensor is first given thirty (30) days' prior written notice. The insurance afforded by the foregoing policy or policies shall not be limited in any way by reason of insurance maintained by Licensor.

9.     <u>Records and Access Thereto; Inspection of Business; Audit Matters.</u>

(a)     <u>Records</u>. Licensee shall establish and maintain at its principal place of business complete, adequate and accurate books, records, accounts and other data, kept in accordance with generally accepted accounting principles, containing all particulars on sales and any other information necessary for an exact determination of all royalties owing to Licensor hereunder and all other amounts payable by Licensee to Licensor hereunder.

(b)     <u>Inspection and Audit of Books and Records</u>. Licensee shall permit (and cooperate with) Licensor and its agents, including accountants and attorneys, through the Term and any extension of this Agreement and upon termination or expiration of this Agreement, to enter upon any business premises of Licensee (including HoneyBaked Outlets) during regular business hours for the purpose of examining and auditing the books, records, accounts and data of Licensee, provided that Licensor shall give Licensee at least 48 hours advance notice prior to any examination or audit.

(c)     <u>Inspection of Operations</u>. During the Term and any extension of this Agreement, Licensee shall also permit (and cooperate with) Licensor and its representatives to enter all HoneyBaked Outlets, including those operated by Licensor's sublicensees, and facilities used in the Business during normal business hours for the purpose of examining the premises and the operation of the Business and conferring with management and other representatives of Licensee or its sublicensees, all in order to determine if Licensee is in compliance with the terms and conditions of this Agreement. Licensor's inspection may include, without limitation, testing, sampling and inspecting the ingredients used by Licensee and its sublicensees and the products sold by it, as well as the storage and preparation of such ingredients and products. Upon written notice from Licensor or its representatives, Licensee shall immediately take all necessary steps to correct any deficiencies including, without limitation, immediately ceasing to use any methods, ingredients, products, or advertising materials which do not conform to Licensor's then-current specifications, standards or requirements.

(d)     <u>Tax Returns</u>. Licensee shall deliver to Licensor, upon request, copies of the quarterly and annual federal and state income tax returns and state sales tax returns filed by Licensee. Licensor agrees that it will maintain such tax returns confidential and that such tax returns may not be used as evidence against Licensee if Licensee obtains a final determination by

a court, arbitrator or other legal authority of competent jurisdiction that such tax returns are not discoverable.

        (e)   <u>Deficiencies</u>.  If an examination or audit by Licensor of the books, records, tax returns and purchase reports of Licensee reveals a deficiency or understatement in royalty or other payments due from Licensee to Licensor, such deficiency or understatement shall be paid to Licensor immediately; if such deficiency or understatement is an amount which exceeds five percent (5%) of the royalties and other amounts paid by Licensee to Licensor for the period examined, Licensee shall immediately pay to Licensor the amount of such deficiency or understatement and all of Licensor's costs of performing such examination or audit including, but not limited to, costs of attorneys and accountants.

        10.   <u>Periodic Reports</u>.  Within twenty (20) days following the close of each calendar month, Licensee shall submit to Licensor, along with the payment of the Ham Royalty, and any other payments then due, a report for the calendar month just closed reflecting the Cured Hams sold by Licensee and its sublicensees. In addition, Licensee shall also submit to Licensor, together with any payment due pursuant to Sections 4(a) and 4(b)(iii) a report reflecting annual Gross Sales for the period for which payment is made. Said reports shall be on such form as Licensor shall from time to time prescribe; a copy of the current form is attached hereto as Exhibit "D." Licensee shall retain a copy of the foregoing items, for a period of at least three (3) years.

        11.   <u>Gift Cards</u>.  Licensee must comply with the Gift Card Participation Agreement dated September 26, 2008 between Licensor, Licensee, and other licensees (the **"Gift Card Agreement"**). Licensee shall have the right to sell in its HoneyBaked Outlets and through Mail Order Transactions gift certificates or stored value cards bearing the Proprietary Marks that consumers may use like gift certificates in HoneyBaked Outlets and in Mail Order Transactions (collectively, **"Gift Cards"**) in accordance with the Gift Card Agreement. Licensee shall honor any and all Gift Cards by Licensor or any of Licensor's other licensees or sublicensees which are presented to Licensee for redemption, by giving to any person presenting such a Gift Card products up to the amount of stored on such Gift Card. Licensee shall, at its own expense, purchase, install, and maintain any software and/or equipment necessary to redeem Gift Cards, as may be specified by Licensor from time to time. Licensee must follow any procedures established by Licensor from time to time to assist in the redemption and processing of Gift Cards, including, but not limited to, procedures related to the settlement of all funds received and owed under the Gift Card program. Licensee may only purchase Gift Cards from suppliers approved by Licensor and may only enter into agreements with retailers or distributors with Licensor's written approval, which Licensor may withhold in its reasonable discretion. Licensor shall exercise its best efforts to ensure that each other licensee or sublicensee outside of the Territory reciprocally honors any and all Gift Cards issued by Licensee.

        12.   <u>Proprietary Marks</u>.

        (a)   <u>Ownership and Protection of Proprietary Marks</u>. Licensee recognizes and acknowledges that (i) the Proprietary Marks are good and valid, (ii) Licensor is the sole and exclusive owner of the Proprietary Marks, including any United States Patent and Trademark Office registrations and applications and any goodwill, and (iii) no interest in the Proprietary

Marks is being transferred to Licensee. Licensee agrees that it will not, during or after the term of this Agreement, contest the ownership or validity of any rights of Licensor in the Proprietary Marks or the registration thereof. Licensee agrees to cooperate fully and in good faith with Licensor in obtaining statutory protection (federal, state or both) for the Proprietary Marks in Licensor's name and in protecting the Proprietary Marks from imitation or infringement by third parties; Licensee agrees that it will not register or attempt to register the Proprietary Marks in its own name or take other actions inconsistent with the foregoing. Licensee further acknowledges that Licensee has not been granted any goodwill in connection with this Agreement.

      (b)   <u>Infringement</u>. Licensee shall promptly report to Licensor any information which comes to its attention, concerning any suit or claim or other demand or proceeding brought or asserted in the Territory challenging the validity of, or relating to, the Proprietary Marks, or any use by a third party of any trademark, service mark, trade name, symbol, insignia, slogan, design, logo, or the like which is confusingly similar to or which otherwise might constitute infringement of the Proprietary Marks. Licensor shall have sole authority to determine whether to institute any legal proceedings alleging infringement of the Proprietary Marks (or to take any other action deemed appropriate by Licensor), and any such litigation shall be conducted under the exclusive control and at the sole expense of Licensor. Licensee shall not institute any such proceeding. In any such infringement suits as Licensor may determine to institute, Licensee shall, at the request and expense of Licensor, cooperate with Licensor in all respects, make all reasonable efforts to have any of Licensee's employees testify when requested by Licensor, and make available to Licensor any relevant records, papers, information and the like. Any recovery obtained as a result of such litigation shall be the property of Licensor; provided, however, that if any portion of any judgment collected, or any unadjudicated settlement paid, is specifically identified as being made due to the lost profits of Licensee resulting from the infringement, such portion shall be payable to Licensee after Licensor has recouped, from such portion of the collected judgment or settlement payment that part of its costs and expenses of the litigation (including its attorneys' fees and costs) reasonably attributable to such portion, and an amount equal to any fees, royalties, or other charges which would have been payable by Licensee to Licensor hereunder had the infringing products with respect to which an award for lost profits has been made to Licensee been sold by Licensee.

    13.   <u>Termination</u>.

      (a)   <u>Termination by Licensor</u>. Without limiting any rights of Licensor in law or equity (which are expressly reserved), Licensor shall have the right to terminate this Agreement prior to the expiration of the Term or during any extension of this Agreement upon the occurrence of any of the events, all of which shall be deemed to be "good cause":

      (i)   <u>Monetary and Other Breaches</u>. The failure by Licensee to (A) pay when due any royalty payments or other fees or charges or claims (including any claims for indemnity) owed to Licensor hereunder within five (5) days after written notice of such failure is given by Licensor to Licensee; or (B) cure a breach by it of any of the terms, obligations, covenants, representations or warranties hereunder within thirty (30) days after written notice of such breach is given by Licensor to Licensee.

(ii)    <u>Financial Failure</u>.  Licensee files a bankruptcy petition or has a bankruptcy petition filed against it and such petition is not dismissed within thirty (30) days thereafter; or Licensee makes an assignment for the benefit of creditors; or Licensee admits in writing its inability to pay its debts generally as they become due; or a receiver, trustee or similar official is appointed for Licensee or for any of its properties.

(iii)    <u>Other Grounds</u>.  The occurrence of any event specified in §20021 of the California Franchise Relations Act as such Act is in effect as of the Effective Date, or the occurrence of any other event that shall be deemed to be good cause for termination under California law.  (In the event of any conflict or inconsistency between the terms and provisions of §20021 of the California Franchise Relations Act or other California law and the terms and provisions hereof, the terms and provisions of §20021 of the California Franchise Relations Act or such other California law shall govern and control).

(b)    <u>Termination by Licensee</u>.  In the event of the failure of Licensor to cure a breach by it of any of the terms, obligations, covenants, representations or warranties hereunder within thirty (30) days after written notice of such breach is given by Licensee to Licensor, Licensee shall have the right to terminate this Agreement.

(c)    <u>Licensee's Obligations on Termination</u>.  Immediately upon termination (for any reason) of this Agreement (prior to the end of the Term or upon the expiration of the Term):

(i)    <u>Cease Use of Proprietary Marks</u>.  All of Licensee's rights hereunder shall terminate and Licensee shall immediately and forever thereafter cease to in any way display, use or otherwise employ the Proprietary Marks, or any confusingly similar name or mark, or any trade dress, designation of origin or description or representation which suggests or represents affiliation, association or connection of Licensee with, or certification, sponsorship or approval of Licensee by, Licensor; and Licensee shall return to Licensor all documents, display items, posters, signs and other items bearing the Proprietary Marks.  Licensee shall forthwith take all action necessary to change its name to a name that does not include any of the Proprietary Marks or any confusingly similar marks, and to terminate all fictitious or assumed business name filings and registrations.

(ii)    <u>Cease Use of Telephone Listings</u>.  Licensee shall as soon as is practicable cancel all telephone and other directory listings and other information or references containing or referring to any Proprietary Marks that have been used in connection with its HoneyBaked Outlets.  Further Licensee agrees that until such listings, information, and references are discontinued it will disclose to any telephone customer that its operation is no longer a HONEYBAKED operation.

(iii)    <u>Cease Use of Internet Accounts</u>.  Licensee shall immediately discontinue use of any and all domain names, social media accounts, or other Internet accounts or pages that incorporate or are similar to any of the Proprietary Marks or contain the letters "HBH" and shall, upon Licensor's request, assign all of its rights to such accounts and domain names to Licensor or cancel all such accounts and domain names.  If Licensee fails to comply with this paragraph, Licensee hereby authorizes Licensor and irrevocably appoints Licensor or

its designee as Licensee's attorney-in-fact to direct any agencies or entities to transfer such accounts or domain names to Licensor. Any third party may accept such direction from Licensor pursuant to this Agreement as conclusive evidence of Licensor's exclusive rights in such accounts or domain names and Licensor's authority to transfer.

(iv)    <u>Pay Amounts Owed</u>.  Licensee shall pay all debts and obligations then owing to Licensor including, but not limited to, those for Royalty Fees and other fees or charges owed hereunder.  In addition, Licensee shall pay to Licensor all of the costs and expenses incurred by Licensor, including attorneys' fees (to the extent that Licensor is the prevailing party, as provided herein), in connection with Licensor's enforcement of its rights hereunder.

(v)    <u>Return of Materials</u>.  Licensee shall return or cause to be returned to Licensor all of the materials in Licensee's possession or under its control which have been furnished by Licensor in connection with this Agreement (including, without limiting the generality of the foregoing, all originals, duplicates or reproductions of any advertising, promotional, or other materials or items which contain or bear the Proprietary Marks or contain any of the Proprietary Information), and shall not thereafter hold out to the public that it is a licensee or otherwise affiliated with Licensor.

(vi)    <u>Assignment of Sublicenses</u>.    Pursuant to the terms of this Agreement and the terms of the sublicense agreements, all of Licensee's right, title and interest in its sublicense agreements shall be assigned, transferred and conveyed to Licensor automatically upon termination of this Agreement prior to the expiration of the Term or any extension of the Term, other than a termination of this Agreement by expiration of its term, in which event all such sublicense agreements must also expire by their terms.

(vii)    <u>HoneyBaked Outlets: Proprietary Information</u>.

(A)    <u>No Sale of Branded Products</u>.    After termination or expiration of this Agreement (for whatever reason), Licensee shall not sell, market or distribute Branded Products (regardless of the source or supplier).

(B)    <u>Licensor's Option for HoneyBaked Outlets</u>.

1)    Subject to a determination by a court, arbitrator or other forum of competent jurisdiction that Licensor may terminate the Agreement on account of a breach by Licensee, then, for a period of ninety (90) days subsequent to such termination or determination (whichever is later), Licensor shall have the option of acquiring the rights to all, but not less than all, of the HoneyBaked Outlets owned by Licensee or its affiliate and acquiring all inventory and personal property owned by Licensee or its affiliate related to the HoneyBaked Outlets.  Such option shall be exercised by Licensor by written notice given to Licensee.

2)    The purchase price for the HoneyBaked Outlets shall be the fair market value of the business operated at the HoneyBaked Outlets (assuming for purposes of the valuation that the HoneyBaked Outlets would continue to be identified with Proprietary Marks).  If the parties are unable to agree upon the fair market value, they shall mutually select an independent appraiser who shall make this determination.  If they are unable

to agree upon an independent appraiser within ten (10) days of Licensor's notice to Licensee, each party shall select an independent appraiser within five (5) days and, within five (5) days of the selection of the later appraiser selected, such appraisers shall select a third appraiser who shall make the determination. Each party shall bear the costs of the independent appraiser selected by them, and they shall share the costs of a mutually selected appraiser or the third appraiser equally.

     3)  Upon election to exercise such option by Licensor, Licensee shall execute and deliver all necessary and appropriate documents and take such other steps as may be necessary in order to make such transfers to Licensor. In the event Licensor elects to exercise such option, the parties recognize and agree that the transaction will include a sale of all "goodwill" associated with such HoneyBaked Outlets other than goodwill which is attributable to Proprietary Marks and the System (which is owned solely by Licensor), and Licensee agrees for a period of three (3) years thereafter not to (I) engage in the business of selling (a) spiral sliced, glazed hams, (b) any of the Branded Products (regardless of the source or supplier and regardless of whether the Proprietary Marks are used) at the time of termination of this Agreement, or (c) other specialty food items; or (II) engage in or have an interest in any retail business selling specialty food products or any similar business located within five (5) miles of any HoneyBaked Outlets which Licensor acquires pursuant to this subparagraph.

     (C)  Proprietary Information.  After the termination or expiration of this Agreement (for whatever reason) and for a period continuing as long as Licensor's Proprietary Information remains proprietary, Licensee shall not disclose or otherwise communicate, or employ or otherwise use in any manner any of the Proprietary Information of Licensor.

     (viii)  Power of Attorney. Licensee agrees that it will execute the limited power of attorney in the form(s) attached as Exhibit "E."

     (d)  Termination of Deep Glazed Agreement. Upon the execution of this Agreement, the Technology License Agreement dated April 12, 2007 between Licensor and Licensee related to the use of Licensee's process to slice and sweeten meat (the "Deep Glazed Agreement") shall terminate and Licensor and its licensees shall cease to have the right to use U.S. Patent No. 7,070,824. In addition, Licensor shall assign to Licensee the trademark "DEEP GLAZED" (U.S. Patent and Trademark Office Registration Number 3,367,311). Upon this termination, Licensee may use, or license others to use, U.S. Patent No. 7,070,824 and the DEEP GLAZED trademark in other businesses. Licensee shall pay Licensor $25,000 in consideration for the termination of the Deep Glazed Agreement and assignment of the DEEP GLAZED trademark.

  14.  Restrictions on Assignment and Transfer.

     (a)  Transfer, of License Agreement by Licensee. Licensee agrees that, except for Transfers (as hereinafter defined) in accordance with this Section 14(a), a sublicense permitted pursuant to Section 15, or a transfer to a trust, the trustee of which is the owner of a Majority Block, as defined below, and the sole beneficiaries of which are transferees approved by Licensor in accordance with the requirements of this Agreement, any Transfer (as hereinafter

defined) of all or any portion of Licensee's rights hereunder is void and transfers no interest whatsoever to the purported transferee, and such attempted Transfer shall constitute a material breach of this Agreement. **"Transfer"** means any voluntary or involuntary, direct or indirect, sale, assignment, pledge, hypothecation, encumbrance, division, alienation or other transfer; Licensee may transfer all, but not less than all, of its rights hereunder only in accordance with the following procedure:

(i)     Right of First Refusal. Licensee shall present to Licensor a copy of any bona fide agreement (i.e., an arm's length agreement (or offer) made in good faith by or between unrelated parties) representing the terms of any proposed Transfer, and Licensor shall have a forty-five (45) day right of first refusal to acquire all Licensee's rights, hereunder on the same terms and conditions as set forth in Licensee's proposed transfer agreement (and Licensor shall have the right to substitute cash consideration equal to any non-cash consideration set forth in such proposed transfer agreement). If Licensor exercises such right of first refusal, Licensee shall reasonably and fully assist and cooperate with Licensor in connection with all requirements, obligations, or other matters related to the exercise of such right. While Licensor determines whether to accept such right of first refusal within such forty-five (45) day time period, Licensor shall also make a determination as to whether the proposed transferee is approved by Licensor as set forth in subparagraph (ii) below.

(ii)     Approval of Transferee. In the event Licensor does not exercise its right of first refusal as set forth in subparagraph (i) above, Licensee may consummate a proposed Transfer only if the proposed transferee is approved by Licensor; such approval shall not be unreasonably withheld by Licensor, and such approval shall be based upon Licensor's reasonable determination of the proposed transferee's (including the owner(s) of transferee) financial capacity, retail and other business experience and all other factors Licensor (in its reasonable discretion) deems pertinent for the successful continued performance of Licensee's obligations hereunder. If Licensor approves the proposed transferee, as a condition precedent to such approval, such transferee shall execute, upon consummation of the proposed Transfer, Licensor's then-current form of agreement offered generally to licensees which may, at Licensor's option, provide for a personal guaranty by the transferee's shareholders in the case of a corporate transferee (Licensor shall not require a guarantee if such proposed corporate Licensee has a net worth equal to at least 10% of Licensee's previous calendar year's Gross Sales (**"Minimum Net Worth"**); provided further, in the event that the net worth of such corporate licensee falls below the Minimum Net Worth, Section 4(h) would immediately become inapplicable and applicable Royalty Fees as set forth in Section 4(a) would thereafter be payable on a monthly basis on or before the fifteenth (15th) day of each month. Any such approval of a proposed transferee shall not constitute a waiver of any claim that Licensor may have against Licensee, any sublicensees (or any owner(s) thereof), or of Licensor's right to demand the transferee's strict compliance with its license agreement. If Licensor does not exercise its right of first refusal during the forty-five (45) day period set forth in subparagraph (i) above, and if Licensor does not approve the proposed transferee within thirty (30) days after the termination of Licensor's forty-five (45) day right of first refusal described in subparagraph (i) above, the proposed transferee will be deemed disapproved, and subparagraph (iii) shall be applicable.

(iii)    Disapproval of Transferee.  In the event the proposed transferee is not approved by Licensor as set forth above, Licensee shall be prohibited from transferring its rights hereunder.

(iv)    Costs and Expenses.  If Licensor does not exercise its right of first refusal, irrespective of whether the proposed transferee is or is not approved, Licensee shall pay to Licensor all of the administrative and other costs incurred by Licensor (including, but not limited to, reasonable attorneys' fees) in connection with the proposed transaction and its assessment of the proposed transferee, except costs incurred by Licensor specifically related to its determination whether or not to exercise its right of first refusal; provided, however, that, except as provided below, in no event shall such cost for any proposed Transfer exceed Twenty Thousand Dollars ($20,000).  If Licensor exercises its right of first refusal, each party shall be responsible for any costs that such party incurs in connection with the transaction.

(b)    Transfer of Ownership Interests.  Except for transfers in accordance with this Section 14(b), any Transfer or issuance of stock or other ownership interests representing fifty percent (50%) or more of the voting control of Licensee (**"Majority Block"**), whether voluntary or involuntary, shall constitute a material breach of this Agreement.  Licensee represents, and the Trusts, as defined below, acknowledge, that as of the date of this Agreement, the outstanding stock of Licensee is owned: (i) 74.24% by Craig Martin, Trustee of The Craig Lee Martin Trust dated September 20, 1979, as amended and (ii) 25.76% by Thaddeus Frank Martin, Trustee of The Thaddeus Frank Martin Trust dated February 28, 2001, as amended. (collectively, the **"Trusts"**).  Licensee shall evidence the restrictions set forth herein as a legend on all stock certificates and the Trusts agree that such a legend may be included on stock certificates evidencing shares of stock owned by each of them.  The Trusts may Transfer (and Licensee may issue) less than a Majority Block at any time without consent or approval of Licensor, so long as, in the aggregate, all such Transfers do not constitute a change of ownership of fifty percent (50%) or more of the voting control of Licensee.  The Transfer of a Majority Block may only be made in accordance with the following procedures:

(i)    Transfer with Consent of Licensor.  Transfers of a Majority Block are permitted only with the prior written consent of Licensor, which consent shall not be unreasonably withheld.

(ii)    Transfer Upon Death; Death of Trustee.

(A)    Continued Ownership.  Upon the death of the owner of a Majority Block, the surviving spouse, heirs or estate of the owner then holding the Majority Block shall have the opportunity for one hundred eighty (180) days from the date of death to satisfy any of Licensor's then current standards for ownership of a licensed entity.  If such spouse, heirs or estate satisfies such standards within such period of time, Licensor shall consent to the Transfer of the Majority Block to such parties, it being the intent of Licensor and Licensee that the foregoing procedure be deemed to satisfy the requirements of Section 20027 of the California Franchise Relations Act.  Upon the death of the trustee of the owner then holding the Majority Block if such owner is a trust, the trust shall have the opportunity for one hundred eighty (180) days from the date of death to appoint a successor trustee who satisfies all of Licensor's then current standards for ownership of a licensed entity.  If such successor trustee

satisfies such standards within such period of time, this Agreement shall not terminate. Upon Craig Martin's death, Thaddeus Frank Martin, Garret Lee Martin, Laurie Martin, Kathy Martin, and Timothy John Frank are each hereby pre-approved as transferees of a Majority Block or as successor trustees for the Majority Block. Any approved transferee or trustee shall be required to agree in writing to the terms and conditions of this Agreement.

(B)     Sale by Heirs.   During the period set forth in Section 14(b)(ii)(A) above, the surviving spouse, heirs, estate or the trust (the trustee of which has died) may also take action to Transfer Licensee's rights hereunder, in which case the provisions of Section 14(a) shall be applicable.

(C)     Licensor's Purchase Option.   In the event the surviving spouse, heirs or estate of the deceased owner then holding the Majority Block or the successor trustee of the owner then holding the Majority Block, as applicable, are not approved by Licensor pursuant to subparagraph (A) of this Section 14(b)(ii), and in the event the rights of Licensee are not transferred in a proper manner pursuant to Section 14(a), Licensor shall have the option, exercisable between one hundred eighty (180) days and two hundred forty (240) days after such owner's or such trustee's death, as applicable, to purchase all of the stock or other ownership interest of Licensee from the holder thereof for a purchase price payable in cash equal to the fair market value of such interest, as determined by appraisal in the same manner set forth in subparagraph 13(c)(vi)(B) above or by arbitration as provided below.

(iii)    Right of First Refusal Upon Other Transfer.   In the event of a proposed Transfer of a Majority Block not expressly permitted by the foregoing provisions, the owner of the Majority Block shall present to Licensor a copy of any bona fide agreement (i.e., an arm's length agreement (or offer) made in good faith by or between unrelated parties) representing the terms of any proposed Transfer, and Licensor shall have a forty-five (45) day right of first refusal to acquire all of Licensee's rights hereunder (rather than such Majority Block) on the same terms and conditions as set forth in the proposed transfer agreement (and Licensor shall have the right to substitute cash consideration equal to any non-cash consideration set forth in such proposed transfer agreement); while Licensor determines whether to accept such right of first refusal within such forty-five (45) day time period, Licensor shall also make a determination as to whether the proposed transferee is approved by Licensor as set forth in subparagraph (iv) below.

(iv)    Approval of Transferee.   In the event Licensor does not exercise its right of first refusal as set forth in subparagraph (iii) above, the owner of the Majority Block may consummate a proposed Transfer only if the proposed transferee is approved by Licensor; such approval shall not be unreasonably withheld by Licensor, and such approval shall be based upon Licensor's reasonable determination of the proposed transferee's (including the owner(s) of transferee) financial capacity, retail and other business experience and all other factors Licensor (in its reasonable discretion) deems pertinent for the successful continued performance of Licensee's obligations hereunder, including, without limitation, Licensor's right to require such transferee to personally guarantee the obligations of Licensee under this Agreement. If Licensor does not exercise its right of first refusal during the forty-five (45) day period set forth in subparagraph (iii) above, and if Licensor does not disapprove the proposed transferee within thirty (30) days of the termination of Licensor's forty-five (45) day right of first refusal described

in subparagraph (iii) above, the proposed transferee will be deemed approved. If Licensor does disapprove the proposed transferee within such period, subparagraph (v) below shall be applicable.

(v)     Disapproval of Transferee. In the event the proposed transferee is disapproved by Licensor as set forth above, the owner shall be prohibited from transferring a Majority Block.

(vi)     Costs and Expenses. Irrespective of whether the right of first refusal is (or is not) exercised or the proposed transferee is (or is not) approved, Craig Martin or his successor in interest shall pay to Licensor all of the administrative and other costs incurred by Licensor (including, but not limited to, reasonable attorneys' fees) in connection with Licensor's assessment (and closing, if appropriate) of the proposed transaction; provided, however, that in no event shall such cost exceed Twenty Thousand Dollars ($20,000).

(c)     Transfer of License Agreement by Licensor. This Agreement and all or any portion of Licensor's rights hereunder are fully transferable (as the term "Transfer" is defined above) by Licensor without the consent of Licensee, and any such Transfers shall inure to the benefit of any transferee or other legal successor to the interest of Licensor herein.

15.     Sublicenses.

(a)     Sublicenses. Subject to the terms and conditions of this Agreement, Licensee is hereby granted the right to sublicense to qualified parties the right to establish and operate HoneyBaked Outlets in the Territory. For each such HoneyBaked Outlet sublicensed by Licensee, Licensee and the sublicensee shall execute a sublicense agreement in such form as has been approved by Licensor pursuant to Section 15(b)(iii) below and is then being offered by Licensee to sublicensees. Licensee shall deliver to Licensor a copy of each sublicense agreement executed between Licensee and a sublicensee, within ten (10) days after execution of same, and keep Licensor apprised at all times as to the location of all HoneyBaked Outlets.

(b)     Registration and Disclosure Obligations.

(i)     Registration and Permits. Before offering or selling any sublicenses, Licensee shall obtain at its own expense all appropriate registration permits as required by any present or future applicable franchise investment law, or similar law regulating the offer and sale of licenses, business opportunities, or franchises in the Territory. Licensee shall timely complete and submit all documents required to renew any licenses, permits, and/or approvals which it is required to possess in order to engage in franchising activities within the Territory and shall keep them in force and in good standing throughout the Term and any extension of this Agreement.

(ii)     Franchise Disclosure Document and Related Documents. In dealing with sublicensees and otherwise conducting its business, Licensee shall comply with all applicable laws and regulations, including those applicable to the solicitation of prospective franchisees and the offering and sale of franchises. Licensee shall provide to Licensor any Franchise Disclosure Document, prospectus, statement of material facts, offering memorandum or any other similar document proposed to be filed or registered with the California Department

of Business Oversight or any other governmental agency or authority in connection with any solicitation or sale of sublicenses, together with true copies of all other material agreements, documents and information required to be prepared, filed or submitted in connection therewith; and shall include in such documents such information as is required concerning Licensor, the System, the Proprietary Marks and other matters; provided, however, that Licensee shall have sole responsibility for compliance with applicable law. Licensee shall at its sole cost and expense make such amendments to such material as shall be required in order to eliminate any untrue statement of material fact or to rectify an omission to state a material fact that is required by applicable law to be stated, or that is necessary to make a statement not misleading in light of the circumstances in which it was made. Licensee agrees to indemnify Licensor from and against any and all claims, demands, suits, liability, losses, costs and expenses incurred as a result of any misrepresentation or omission made by Licensee to any person in connection with the solicitation or sale of a franchise for a Sublicensed Unit or in connection with any violation by Licensee of any applicable law, rule or regulation pertaining to the solicitation or sale of franchises. Licensee's failure to comply with the provisions of this Section shall constitute a material default under this Agreement.

(iii)     Sublicense Agreements. All sublicense agreements executed by sublicensees, and all other agreements between Licensee and its sublicensees relating to the operation of HoneyBaked Outlets shall be on such forms as may be approved in advance by Licensor in writing. Licensee shall modify such forms in such manner, and at such times, as Licensor may request for the protection of Licensor's interests, and shall thereafter use only the modified form approved by Licensor. In no event shall Licensor give its approval to any sublicense agreement which fails to impose all obligations and requirements imposed upon sublicensees pursuant to this Agreement or which fails, in Licensor's sole discretion, to adequately protect Licensor's name, reputation and goodwill, the Proprietary Marks, the confidentiality of Proprietary Information, and all other rights of Licensor under this Agreement. Licensee acknowledges that the sublicense agreement will require the sublicensee to perform all of the quality control and other obligations of the Licensee hereunder and allows Licensor to enforce the obligations of the sublicensee if Licensee fails or refuses to do so, and provides for the transfer of Licensee's rights to Licensor upon termination of Licensee's rights hereunder. Licensee acknowledges and agrees that the sublicense agreement will specifically provide that Licensor is a third party beneficiary as it relates to the rights of Licensee and obligations of sublicensee.

(c)     Existing Sublicenses. The parties acknowledge that Licensee has entered sublicense agreements with existing sublicensees. Licensee understands that this acknowledgement by Licensor does not release Licensee from its obligations under this Agreement and that, in the event a sublicensee is in breach of performance of any of the quality control or other obligations of Licensee hereunder, whether or not the equivalent provisions are included in the applicable sublicense agreement, such breach by sublicensee shall constitute a breach by Licensee under this Agreement. Licensor may terminate this Agreement for a breach of this Agreement caused by a sublicensee, if (i) Licensee fails to cure, or cause such sublicensee to cure, such breach to Licensor's satisfaction thirty (30) days after written notice of such breach is given by Licensor to Licensee or (ii) if, in Licensor's reasonable judgment, such breach cannot be corrected within thirty (30) days after receipt of written notice, Licensee fails to undertake its reasonable efforts to correct, or cause the sublicensee to correct, such breach within such 30-day

period and/or fails to diligently continue such efforts to completion in a reasonable period of time. Licensee agrees that on or prior to April 30, 2016, Licensee shall offer all existing sublicensees who are not in default under their existing sublicense agreements the opportunity to enter into a successor term by executing a new sublicense agreement that has been approved by Licensor in accordance with Sections 15(a) and (b)(iii) above.

16.     General Indemnity. Licensee shall indemnify, protect and defend Licensor and any and all partners, officers, directors, agents, representatives, attorneys, assignees, owners or affiliates thereof (the **"Indemnified Parties"**) from and against and shall hold the Indemnified Parties harmless from any and all claims, costs, suits, charges, judgments, causes of action or expenses (including reasonable attorneys' fees) incurred by or asserted against Indemnified Parties (i) in any way arising out of Licensee's (or its sublicensees') ownership or operation of the Business or sale of products from the Business during the Term and any extension hereof or during the term of the Prior License Agreement or any preceding license agreement, or (ii) in any way arising out of or related to any other activities or actions of Licensee (or its sublicensees) prior to, during or after the Term of this Agreement. In the event of a claim for which the foregoing indemnification and hold harmless protection is applicable, Indemnified Parties shall give Licensee notice of such claim, such that Licensee shall have the opportunity to properly defend and contest such claim. If Licensee fails to properly and promptly defend or contest such claim, Indemnified Parties may effectuate and prosecute such defense or contesting of such claim, and Licensee shall be liable to Indemnified Parties for any resulting costs, damages, judgments, awards or similar expenditures of Indemnified Parties. The indemnities contained in this Section shall survive the expiration or termination of this Agreement.

17.     Prior License Agreement. Upon commencement of the Term on the Effective Date, the Prior License Agreement shall automatically be superseded in its entirety. Prior to the commencement of the Term, from the Execution Date to the Effective Date, the Prior License Agreement shall remain in full force and effect, subject to earlier termination in accordance with its terms.

18.     Acknowledgements and Representations.

(a)     Licensee acknowledges and represents to Licensor as follows: (a) Licensee has read this agreement and understands and accepts the provisions, conditions and covenants contained in this Agreement as being reasonably necessary to maintain Licensor's high standards of quality and service and the uniformity thereof pursuant to the system; (b) Licensee has conducted an independent investigation of the matters contemplated by this Agreement and Licensee recognizes that the nature of the business conducted hereunder may evolve and change over time, that a continued investment in the Business pursuant to this agreement involves business risks, and the success of such Business depends primarily upon Licensee's business ability and efforts; (c) Licensee acknowledges it has consulted with such professional advisors as Licensee deemed necessary to determine that Licensee is financially prepared to assume the risk that may be involved in such a business venture as described and permitted in this Agreement; (d) Licensee has not received or relied upon any promise, representation, guaranty or warranty, express or implied, about the revenues, profits, or success of the business venture contemplated by this agreement; (e) no representations have been made or authorized by Licensor, or by its officers, directors, shareholders, employees or other agents,

that are contrary to the terms contained in this agreement, and Licensee has not relied upon any other such representations; and (f) in all dealings with Licensee, the officers, directors, employees, and agents of Licensor act (and have acted) only in a representative capacity, not in an individual capacity, and this Agreement, and all business dealings between Licensee and such individuals as a result of this Agreement, are solely between Licensee and Licensor.

(b)     Licensee acknowledges and represents to Licensor that as of the Execution Date, Licensee is compliant in all material respects with the terms and conditions of the Existing Agreement.  Licensee represents that as of the Execution Date, it has presented Licensor with (i) a listing of all HoneyBaked Outlet locations, the lessor or owner of all real property for HoneyBaked Outlets, and a description of the relationship between such lessor or owner and Licensee, (ii) a current copy of all insurance policies that are in effect as of the Execution Date, all of which are fully compliant with the terms of this provision, and (iii) complete copies of all sublicense agreements that are in effect as of the Execution Date.  Licensee shall provide updates to all of the foregoing information provided prior to the Effective Date.

19.     Relationship of Parties and Liability of Licensor.   This Agreement does not create, and the parties hereto acknowledge, that there is no fiduciary relationship between the parties, that Licensee is and shall be an independent contractor, that no employee of Licensee shall be deemed to be an employee of Licensor, and that nothing in this Agreement is intended to make either party a general or special agent, joint venturer, partner, or employee of the other for any purpose.  Except as expressly authorized by this Agreement, neither Licensor nor Licensee shall make any express or implied agreements, warranties, guaranties or representations or incur any debt, in the name of or on behalf of the other, or represent that their relationship is other than Licensor and Licensee, and neither Licensor nor Licensee shall be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized under this Agreement.  Licensee shall not employ any of the Proprietary Marks in signing any contract, check, purchase agreement, negotiable instrument or other legal obligation, application for any license or permit, or in any manner that may result in liability of Licensor for any indebtedness or obligation of Licensee.  Licensor shall not be obligated for any damages to any other person or third party directly or indirectly arising out of the operation of any HoneyBaked Outlet or the Business, whether caused by Licensee's negligent or willful action or failure to act, and Licensor shall have no liability for any sales, income, gross receipts, property or any other taxes, whether levied upon Licensee, any HoneyBaked Outlet, the Business, or Licensee's property, or upon Licensor or its affiliates, in connection with sales made or business conducted by Licensee or payments to Licensor pursuant to this Agreement, other than income taxes levied solely upon Licensor by reason of income derived by the Licensor from payments made to Licensor by Licensee pursuant to this Agreement.

20.     Enforcement.

(a)     Severability and Substitution of Valid Provisions.   Except as may expressly be provided to the contrary herein, each section, paragraph, subparagraph, term, or any other provision of this Agreement, and any portion thereof, shall be considered severable and if, for any reason, any such provision of this Agreement is held to be invalid or otherwise not enforceable, such holdings shall not impair the operation of, or have any other effect upon, any other portions of this Agreement as may remain otherwise enforceable and which shall continue

to be given full force and effect and bind the parties to this Agreement. If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required under this Agreement, or the taking of some other action not required under this Agreement, or if under any applicable and binding law or rule of any jurisdiction any provision of this Agreement or any specification, standard or operating procedure prescribed by Licensor is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions of this Agreement, and Licensor shall have the right, in its reasonable discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable. The description of any default in any notice served by Licensor upon Licensee shall in no way preclude Licensor from specifying additional or supplemental defaults in any action, hearing, suit or other matter relating to this Agreement or the termination of this Agreement. Modifications (pursuant to this subparagraph) to this Agreement shall be effective only in such applicable jurisdiction, unless Licensor elects to give them greater applicability, and shall be enforced as originally made and entered into in all other jurisdictions.

(b)     Survivability of Obligations.    All obligations of Licensee (and sublicensees of Licensee) to pay any royalty payments or other fees or charges or claims (including any claims for indemnity) owed to Licensor and all amounts owed by Licensor to Licensee, if any, shall survive the expiration or termination of this Agreement and shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement and until such outstanding amounts are satisfied in full.

(c)     Cumulative Rights of Parties.    The rights of Licensor and Licensee hereunder are cumulative; any exercise or enforcement of any right or remedy shall not preclude the exercise or enforcement of any other right or remedy hereunder or any other right or remedy that Licensor or Licensee is entitled by law to enforce.

(d)     Arbitration and Other Remedies.

(i)     Except as otherwise provided in subparagraph d(ii) below and without prejudice to the rights of either party to enforce specific provisions of this Agreement, including termination of this Agreement, in respect of a breach of this Agreement by the other party, any controversy or claim arising out of or relating to this Agreement or the relationship between the parties established hereby including without limitation, any claim that this Agreement, or any part thereof, is invalid, illegal or otherwise voidable or void, shall be submitted to final and binding arbitration before the American Arbitration Association in accordance with its commercial rules applicable to proceedings determined by one (1) arbitrator, and judgment upon any award it may grant may be confirmed and entered in any court of competent jurisdiction. The arbitrator for such arbitration shall be an individual with not less than five (5) years' full-time experience in the franchise industry. Service of any arbitration claim hereunder may be effected pursuant to the notice provisions of subparagraph (h). This provision shall be deemed self-executing and an award may be entered against a party who fails to appear at any duly noticed hearing. This provision shall survive the termination of this Agreement. The parties acknowledge that the transactions and relationship contemplated by this Agreement involve interstate commerce and agree that the enforcement of this arbitration

provision, the confirmation of any award issued to either party by reason of an arbitration proceeding conducted hereby, and all other rights and duties of the parties shall be governed by the Federal Arbitration Act set forth in 9 U.S.C. §1, et seq. Any such arbitration shall be conducted at facilities maintained by the American Arbitration Association for such purposes in Orange County, California.

(ii)     Nothing in this Agreement, including in particular the provisions of subparagraph (i) above, shall be construed as limiting or precluding Licensor from bringing any action in any court of competent jurisdiction for injunctive or other extraordinary relief, without the necessity of posting any bond (and if bond shall nevertheless be required by a court of competent jurisdiction, the parties agree that the sum of $100 shall be sufficient bond), as Licensor deems necessary or appropriate to compel Licensee to comply with its obligations hereunder respecting the use or display of the Proprietary Marks, trade dress or Proprietary Information or to otherwise protect such items. Licensee acknowledges that it is one of a number of licensees and sublicensees using the Proprietary Marks (including without limitation the enforcement of Licensee's obligation to change its name set forth in subparagraph 13(c)(i) above), trade dress and Proprietary Information and that failure on its part to comply fully with any of the terms of this Agreement respecting use of the such items could cause irreparable damage to Licensor and other licensees and sublicensees of Licensor. Therefore, the Licensor shall have the immediate right to seek a preliminary order or injunction prohibiting the use or display of the Proprietary Marks or unauthorized disclosure or use of the Proprietary Information during the pendency of all arbitration or other proceedings, without the necessity of posting a bond. This covenant shall be independent, severable and enforceable notwithstanding any other rights or remedies which Licensor may have.

(iii)     Either party shall have the right to seek and obtain from any court of competent jurisdiction any equitable or provisional relief or remedy enforcing any right or interest it may have in connection with this Agreement, including without limitation a temporary restraining order, preliminary injunction, writ of attachment, order compelling an audit, or enforcement of any liens or security interests held by either party in the property of the other.

(iv)     The parties acknowledge that no award or determination in any other adjudication or arbitration proceeding shall have any effect upon a claim or dispute hereunder and no party shall be collaterally estopped from bringing a claim on that basis.

(e)     Governing Law. The law of the State of California shall govern all questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations hereunder, provided that this provision shall not be deemed to confer exclusive jurisdiction upon the California courts.

(f)     Binding Effect. Subject to the provisions set forth herein, this Agreement is binding upon the parties to this Agreement and their respective executors, administrators, heirs, assigns and successors in interest, and shall not be modified except by written agreement signed by both Licensor and Licensee.

(g)     Construction. The preambles and exhibits are a part of this Agreement, which constitutes the entire agreement of the parties, and any prior understandings and

agreements, whether written or oral, including without limitation, the Prior License Agreement previously entered into (as may have been amended), are hereby superseded. Nothing in this Agreement is intended, nor shall be deemed to confer any rights or remedies upon any person or legal entity not a party to this Agreement. The headings of any sections and paragraphs hereof are for convenience only and do not define, limit or construe the contents of such sections or paragraphs. Any use or reference to "Licensee" shall include, wherever applicable, any and all sublicensees of Licensee, whether or not such sublicensees are specifically referenced. The singular usage includes the plural and the masculine and neuter usages include the other and the feminine. This Agreement shall be executed in multiple copies, each of which shall be deemed an original.

(h)     Notices and Payments. Except as otherwise expressly provided herein, all written notices or other communications permitted or required to be made by the provisions of this Agreement or the Standards Manual, shall be deemed so made on the date and at the time of personal delivery or three (3) business days after deposit in the U.S. mail, first class postage prepaid, directed to the parties at the addresses set forth opposite their signatures below. All payments and reports required by this Agreement shall be directed to Licensor at the address set forth opposite Licensor's signature below, or to such other persons and places as Licensor may direct from time to time. The parties may change such addresses from time to time by notice to the other party delivered in accordance with the provisions of this paragraph.

(i)     Fees and Expenses. In the event any party commences any action or proceeding for the purpose of enforcing, or preventing the breach of, any provisions hereof, including without limitation any claim that this Agreement is void ab initio and including, without limitation, the enforcement of Licensee's obligation to change its name set forth in subparagraph 13(c)(i) above, whether by arbitration, judicial or quasi-judicial action or otherwise, or for damages for any alleged breach of any provision of this Agreement, or for a declaration of such party's rights or obligations under this Agreement, then the prevailing party shall be reimbursed by the losing party for all costs and expenses incurred in connection therewith, including, but not limited to, attorneys' fees for the services rendered to the prevailing party.

(j)     Communications with the Board and Licensor. Upon prior written notice, Craig Martin or his designee shall have the right to submit matters for consideration by the board of directors of HBH, Inc., the general partner of Licensor, for so long as Craig Martin owns at least fifty percent (50%) of the entity that is the Licensee under this Agreement or is the trustee of a trust that owns at least fifty percent (50%) of the entity that is the Licensee under this Agreement. Licensor shall provide Licensee with semi-annual updates regarding system-wide initiatives, provided that Licensor shall have the right to discontinue such updates at any time.

(k)     General Release. As a condition of entering into this Agreement, Licensor and Licensee shall enter into a mutual general release, in the form attached as Exhibit F.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on
4/23 , 2015.

Party                                          Address

HBH LIMITED PARTNERSHIP

By:   HBH, INC., a Delaware corporation, general partner of
      HBH LIMITED PARTNERSHIP

By: _Craig Kurz_____                       11935 Mason Montgomery Rd.
     Craig A. Kurz, President                  Cincinnati, Ohio 45249
                                               _____


HONEY BAKED HAM, INC.

By: _Craig L. Martin_____                  29 Musick
                                               Irvine, CA 92618
Title: _PRESIDENT_____                     _____


Acknowledged and Agreed to:

THE CRAIG LEE MARTIN TRUST UTD 9/20/79 , AS AMENDED

By: _Craig L. Martin_____                  29 Musick
     Craig Martin, Trustee                     Irvine, CA 92618


THE THADDEUS FRANK MARTIN TRUST UTD 2/28/01 , AS AMENDED

By: _C/L, Trustee_____                     29 Musick
     Thaddeus Frank Martin, Trustee            Irvine, CA 92618

## EXHIBIT A

### Proprietary Marks

| Mark | Registration Number | Registration Date |
|---|---|---|
| HONEY BAKED HAM | 1,384,504 | February 25, 1986 |
| HONEYBAKED | 1,861,924 | November 8, 1994 |
| HONEYBAKED | 3,049,064 | January 24, 2006 |
| THE HONEYBAKED HAM COMPANY | 2,126,500 | January 6, 1998 |
|  | 2,136,466 | February 17, 1998 |
|  | 2,150,993 | April 14, 1998 |
|  | 3,452,316 | June 24, 2008 |
| THE HONEYBAKED HAM CO. AND CAFÉ | 2,534,573 | January 29, 2002 |

## **EXHIBIT B**

### **Branded Products**

Note:  * Denotes Spec Products

- **Ham**
  - o  Quarter Bone-in Ham*
  - o  Half Bone-in Ham (6-11 pounds)*
  - o  Whole Bone-in Ham (13-16 pounds)*
  - o  **Boneless Ham**
- **Turkey and Poultry**
  - o  Oven-Roasted Sliced & Glazed Turkey Breast*
  - o  Smoked Sliced & Glazed Turkey Breast*
  - o  Glazed Oven Roasted Whole Turkey *
  - o  Glazed Smoked Whole Turkey*
  - o  Oven-roasted Whole Turkey*
  - o  Smoked Whole Turkey *
  - o  Cajun Fried Whole Turkey*
  - o  Deep-Fried Whole Turkey
  - o  Stuffed Cornish Game Hens
  - o  Roasted Shaped Turkey Breast*
  - o  Smoked Shaped Turkey Breast*
  - o  Roasted Natural Turkey Breast*
  - o  Smoked Natural Turkey Breast*
  - o  Roasted Natural Turkey Breast Skinless*
  - o  Smoked Natural Turkey Breast Skinless*
- **Beef and Ribs**
  - o  ~~10 oz. Ribeye Steaks~~
  - o  ~~6 oz. Filet Mignon~~
  - o  ~~10 oz. Beef Strip Steaks~~
  - o  Prime Rib Roast
  - o  Beef Tri-Tip Roast
  - o  BBQ Brisket
  - o  Beef Pot Roast
  - o  Barbecued Baby Back Pork Ribs
  - o  Barbecued Beef Ribs
- **Pork**
  - o  Cranberry & Apple Stuffed Pork Loin
  - o  Cornbread & Sausage Stuffed Pork Loin
  - o  Pork Loin Roast with Wine Sauce
  - o  Canadian Bacon
  - o  Hickory Smoked Thick Sliced Bacon
  - o  Sliced Stand-Up Bacon
- **Other Products**
  - o  Keepsake Cutting Board
  - o  HoneyBaked Ham Rack
  - o  HoneyGrand

## **EXHIBIT C**

## **Non-Branded Products**

- **Cheese and Fruit**
  - o Baby Swiss Cheese Wheel (2 lb.)
  - o Pears, 3 Fuji Applies, 1/6 lb. English Toffee, 1/6 lb. Roasted Almonds (gift basket)
  - o Golden State Deluxe Fruit Collection - Box of Gourmet Crackers, 2 Dessert Pears, 1 Red Pear, 2 Fuji Apples, 3 Navel Oranges, 1 Granny Smith Apple, 1 Mango, and 2 Kiwis
- **Sides**
  - o Green Bean Casserole
  - o Yam/Sweet Potato Soufflé
  - o Cheesy Scalloped Potatoes
  - o Creamed Corn
  - o Cranberry Sauce/Salad
  - o Made-From-Scratch Stuffing
  - o Old Fashioned Cornbread Mix
  - o Cranberry Cornbread Mix
  - o Buttermilk Pancake Mix
  - o English Muffins
  - o Gourmet Crackers
  - o Gourmet Wafers
  - o Pecan Stuffing
  - o Mashed Potatoes
  - o Apple Sauce
- **Condiments**
  - o Cranberry Walnut Chutney
  - o Maple Syrup
  - o Champagne Gourmet Mustard
  - o Whole Grain Gourmet Mustard
  - o HoneySweet Horseradish
  - o HoneySweet Sweet Garlic Mustard
  - o HoneySweet Cranberry Walnut Chutney
  - o HoneySweet Pineapple Ginger Chutney
  - o Turkey Gravy
  - o Mesquite BBQ Sauce
  - o Robust Coffee (ground and vacuum packed)
  - o Snack Nuts
  - o Candy
  - o Pancake mix
  - o Hot sauces

- **Soup**
  - o HamBone Soup Mix/Mixed Bean Soup Mix (comes with a HoneyBaked Ham bone)
  - o Split Pea Soup Mix
  - o Navy Bean Soup Mix
  - o Mixed Bean Soup Mix
  - o White Bean Soup Mix

- **<u>Desserts</u>**
  - o Cheesecake Sampler (includes NY, Pecan Crunch, Chocolate Swirl, and Apple Caramel; may also include Turtle and Raspberry)
  - o Cinnamon Walnut Coffee Cake
  - o White Chocolate Raspberry Tart

## EXHIBIT D

**Current Form of Reports Required by Section 10**

# Honey Baked Ham, Inc.
# Royalty Report for Trust

For December 2014

|  | Hams Purchased | To Trust |
|---|---|---|
| **Owned Stores** | | |
| ANAHEIM | | |
| RANCHO MIRAGE | | |
| LAKE FOREST | | |
| HUNTINGTON BEACH | | |
| SACRAMENTO | | |
| FRESNO | | |
| LA MESA | | |
| SAN JOSE | | |
| PALO ALTO | | |
| SAN DIEGO | | |
| ENCINITAS | | |
| OAKLAND | | |
| FAIR OAKS | | |
| FREMONT | | |
| ESCONDIDO | | |
| CHULA VISTA | | |
| CONCORD | | |
| STOCKTON | | |
| PLEASANTON | | |
| NORTHRIDGE | | |
| COLMA | | |
| BAKERSFIELD | | |
| VENTURA | | |
| **Total** | | |
| | | |
| **Franchise Stores** | | |
| NO.HOLLYWOOD | | |
| GLENDALE | | |
| ORANGE | | |
| RIVERSIDE | | |
| SAN BERNARDINO | | |
| TUSTIN | | |
| PASADENA | | |
| WEST COVINA | | |
| UPLAND | | |
| LA HABRA | | |
| TORRANCE | | |
| LAKEWOOD | | |
| CULVER CITY | | |
| **Total** | | |
| | | |
| **Total All Store** | | |

Signature _____   Date _____   Check # _____

# Honey Baked Ham, Inc.
## Royalty Detail Report
### For December 2014

For store location:

| Invoice | Date | Total Hams | Total Lbs | Total Cost | 14/16 SBO ---- | 15/17 SBO ---- | 61 3631 | 521 3481 | 31 3471 | /15 4455 | /13 SBO |
|---------|------|-----------|-----------|-----------|------------|------------|---------|----------|---------|----------|---------|
| | | | | | | | | | | | |

Total Cases

Hams Per Case

Total Hams

Total hams for all sizes

Royalty amount per ham

Net royalty

**EXHIBIT E**

**Limited Power of Attorney**

For valuable consideration, the receipt of which is hereby acknowledged, the undersigned, HONEY BAKED HAM, INC., a California corporation, ("Licensee") on behalf of itself and its officers, directors and shareholders, hereby constitutes and appoints HBH LIMITED PARTNERSHIP, a Michigan limited partnership, and its general partner(s), ("HBH") as its lawful and authorized attorney-in-fact, to act in its name, place and stead, to take any and all actions and sign any and all documents necessary to cause Licensee to comply with its obligations following termination or expiration of that certain License Agreement dated _____4/23/15_____ between Licensee and HBH as set forth in such License Agreement including, without limitation, the obligation to change its name, cancel all telephone listings, cancel or assign all Internet accounts or domain names, and cease all use of HBH's trademarks and Proprietary Information.

HBH shall have the right, power and authority, without further action, approval or consent on the part of Licensee to take any or all of such actions.

Licensee intends that this power of attorney be coupled with the interest contemporaneously granted herewith pursuant to the License Agreement, and declares this power of attorney to be irrevocable. Licensee renounces all right to revoke it or to appoint another person to perform the acts referred to herein.

IN WITNESS WHEREOF, Licensee has executed this Power of Attorney as of _____4/23/15_____.

LICENSEE: HONEY BAKED HAM, INC.

By: _Craig L. Martin_

Title: _PRESIDENT_

State of California)
County of Orange)

On _4/23/15_, before me, _Pamela M. Norton_ personally appeared Craig L. Martin personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(X) whose name(X) is/aXe subscribed to the within instrument and acknowledged to me that he/sXe/thXy executed the same in his/hXr/thXr capacity(iXs), and that by his/hXr/thXr signature(X) on the instrument the person(X), or the entity upon behalf of which the person(X) acted, executed the instrument.

WITNESS my hand and official seal.

Signature: _Pamela M. Norton_     see attached Acknowledgement     (Seal)

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    **CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                          )
County of _ORANGE_____           )

On _APRIL 23, 2015_ before me, _PAMELA M. NORTON_____,
　　　　_Date_　　　　　　　　　　_Here Insert Name and Title of the Officer_

personally appeared _CRAIG LEE MARTIN AND THAD FRANK MARTIN_
　　　　　　　　　　　　　_Name(s) of Signer(s)_

_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> PAMELA MACRAE NORTON
> Commission # 2002489
> Notary Public - California
> Riverside County
> My Comm. Expires Dec 30, 2016

Signature _Pamela M Norton_
　　　　　　　_Signature of Notary Public_

_Place Notary Seal Above_

──────────────────── **OPTIONAL** ────────────────────

_Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document._

**Description of Attached Document**
Title or Type of Document: _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

## EXHIBIT F

## GENERAL RELEASE

## RELEASE AGREEMENT

This Release Agreement ("**Agreement**") is made and entered into as of
ApRiL 23, 2015   (the "**Execution Date**"), by and between HBH LIMITED PARTNERSHIP, a Michigan limited partnership ("**Licensor**") and Honey Baked Ham, Inc., a California corporation ("**Licensee**").   Licensor and Licensee are referred to herein as the "**Parties.**"

**WHEREAS**, Licensor and Licensee were parties to a License Agreement dated January 1, 1996 related to the use of the HoneyBaked marks and system in California (the "**Prior License Agreement**");

**WHEREAS**, Licensor and Licensee have entered into a HoneyBaked Ham® License Agreement for the State of California dated as of the Effective Date, which supersedes the terms of the Prior License Agreement (the "**License Agreement**");and

**WHEREAS**, as a condition of executing the License Agreement, the Parties have agreed to execute this Agreement releasing certain claims each Party may have, or may in the future have, against the other Party and certain related parties.

**NOW, THEREFORE,** in consideration of the mutual covenants and obligations contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     <u>**General Releases**</u>

    **a.**   <u>**By Licensee.**</u>  Licensee, on behalf of itself and its affiliates and its and their respective current and former, officers, directors, shareholders, members, managers, agents, employees, attorneys, heirs, executors, successors, assigns and representatives (collectively, the "**Licensee Parties**"), hereby releases and discharges Licensor and its affiliates, and their respective current and former, officers, directors, shareholders, members, managers, agents, employees, attorneys, heirs, executors, successors, assigns and representatives (collectively, the "**Licensor Parties**") of and from any and all claims, demands, debts, liabilities, actions, and causes of action of whatever kind or nature, whether known or unknown, vested or contingent, suspected or unsuspected (collectively, "**Claims**"), which any Licensee Party ever owned or held, now own or hold, or may in the future own or hold, against the Licensor Parties, or any one or more of them, arising out of, or relating to any act, omission or event occurring on or before the Execution Date of this Agreement.

    **b.**   <u>**By Licensor.**</u>  Licensor, on behalf of itself and its affiliates and its and their respective current and former, officers, directors, shareholders, members, managers, agents, employees, attorneys, heirs, executors, successors, assigns and representatives, hereby releases and discharges Licensee and its affiliates, and their respective current and former, officers, directors, shareholders, members, managers, agents, employees, attorneys, heirs, executors, successors, assigns and representatives of and from any and all claims, demands, debts, liabilities, actions, and causes of action of whatever kind or nature, whether known or unknown, vested or contingent, suspected or unsuspected, which any Licensor Party ever owned or held, now own or hold, or may in the future own or hold, against the Licensee Parties, or any one or

more of them, arising out of, or relating to any act, omission or event occurring on or before the date of this Agreement.

**2.**      **Risk of Changed Facts.** Licensee (on behalf of the Licensee Parties) and Licensor (on behalf of the Licensor Parties) understand that the facts in respect of which its release in Section 1 is given may turn out to be different from the facts now known or believed by them to be true. Licensee and Licensor hereby accept and assume the risk of the facts turning out to be different and agree that the releases in Section 1 shall nevertheless be effective in all respects and not subject to termination or rescission by virtue of any such difference in facts. The Parties acknowledge that they are aware and informed that the laws of California may purport to limit or reduce the effect of a general release with respect to claims not known or suspected by them at the time of execution of the Agreement, such as Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release which, if known by him, must have materially affected the settlement with the debtor."

Licensee (on behalf of the Licensee Parties) and Licensor (on behalf of the Licensor Parties) waive and relinquish every right or benefit which they have, or may have, under Section 1542 of the Civil Code of the State of California, and under any similar provisions of any other law (as may be applicable to this Agreement), to the fullest extent that Licensee and Licensor may lawfully waive such right or benefit pertaining to the subject matter of this Agreement. Licensee (on behalf of the Licensee Parties) agrees to defend, indemnify and hold harmless the Licensor Parties from any and all released Claims arising out of, directly or indirectly, the assertion by the Licensee Parties (or any person or entity by, through, or on their behalf) of any released Claims, positions, defenses, or arguments contrary to this Section 2 of this Release. Licensor (on behalf of the Licensor Parties) agrees to defend, indemnify and hold harmless the Licensee Parties from any and all released Claims arising out of, directly or indirectly, the assertion by the Licensor Parties (or any person or entity by, through, or on their behalf) of any released Claims, positions, defenses, or arguments contrary to this Section 2 of this Release.

**3.**      **No Prior Assignment and Competency.**

**a.** Licensee (on behalf of the Licensee Parties) represents and warrants that: (i) the Licensee Parties are the sole owners of all Claims and rights released in Section 1(a) and that the Licensee Parties have not assigned or transferred, or purported to assign or transfer, to any person or entity, any Claim released under Section 1(a); (ii) Licensee has full and complete power and authority to execute this Agreement, and that the execution of this Agreement shall not violate the terms of any contract or agreement between them or any court order; and (iii) this Agreement has been voluntarily and knowingly executed after Licensee has had the opportunity to consult with counsel of their own choice.

**b.** Licensor (on behalf of the Licensor Parties) represents and warrants that: (i) the Licensor Parties are the sole owners of all Claims and rights released in Section 1(b) and that the Licensor Parties have not assigned or transferred, or purported to assign or transfer, to

any person or entity, any Claim released under Section 1(b); (ii) Licensor has full and complete power and authority to execute this Agreement, and that the execution of this Agreement shall not violate the terms of any contract or agreement between them or any court order; and (iii) this Agreement has been voluntarily and knowingly executed after Licensor has had the opportunity to consult with counsel of their own choice.

**4.    Covenant Not to Sue.**  Licensee (on behalf of the Licensee Parties) and Licensor (on behalf of the Licensor Parties) covenant not to initiate, prosecute, encourage, assist, or (except as required by law) participate in any civil, criminal, or administrative proceeding or investigation in any court, agency, or other forum, either affirmatively or by way of cross-claim, defense, or counterclaim, against any person or entity that it has released under Section 1 with respect to any Claims that it has released under Section 1.

**5.    Complete Defense.**  Licensee (on behalf of the Licensee Parties) (i) acknowledges that the release in Section 1(a) shall be a complete defense to any Claim released under Section 1(a); and (ii) consents to the entry of a temporary or permanent injunction to prevent or end the assertion of any such Claim.  Licensor (on behalf of the Licensor Parties) (i) acknowledges that the release in Section 1(b) shall be a complete defense to any Claim released under Section 1(b); and (ii) consents to the entry of a temporary or permanent injunction to prevent or end the assertion of any such Claim.

**6.    Successors and Assigns.**  This Agreement will inure to the benefit of and bind the successors, assigns, heirs, and personal representatives of the Licensor Parties and Licensee Parties.

**7.    Counterparts.**  This Agreement may be executed in two or more counterparts (including by facsimile), each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed by their duly authorized representatives.

| | |
|---|---|
| **HBH LIMITED PARTNERSHIP, a Michigan limited partnership** | **HONEY BAKED HAM, INC., a California corporation** |
| By: _Craig Kurr_ | By: _Craig L. Martin_ |
| Name: _CRAIG KURR_ | Name: _CRAIG L MARTIN_ |
| Title: _PRESIDENT_ | Title: _PRESIDENT_ |
| Date: _5/1/15_ | Date: _4/23/15_ |

3

# EXHIBIT B



July 22, 2019

Mr. Richard Gore
HoneyBaked Ham, Inc.
29 Musick St.
Irvine, CA 92618

Dear Richard,

I am writing to summarize our call today.  Over the past year we have discussed on several occasions the counterproductive structure we have on the World Wide Web.  I also sent you several documents outlining the nature of the problem of which you are well acquainted (August 20 2018 and February 4th 2019).  The level at which our structure is blocking our ability to utilize the Web as our competition does, is jeopardizing the long term health of our business and brand.

The Web is now the primary place consumers go to ideate about purchase options.  The basis of our structure runs against everything the Web tries to offer consumers, open and easy access to purchase when a consumer is ready to buy.  Our only national site, HONEYBAKED.com, which does not have a shopping cart, is used as a sorting mechanism to direct consumers to non-indexed sites to our purchase product.  This prevents us from operating competitively on the Web.

When customers try to search for us by our trademark, the search engines are regularly indexing competing or unrelated third party websites as highly, or often, higher than our website in organic search results.   A Google search for "honey baked ham" returns a results for ezcater.com, Smithfield, Harry and David, Amazon (obviously not us or sponsored by us).   In speaking with experts in the field, I understand that search engines are ranking our website lower than it should be due to perceived lesser relevance of our site and lack of purchase capability.  They note that our website is nothing more than a splash page plus a few brochure pages.  The loss of consumers is significant as they are presented with a multitude of choices other than our national splash page.

For those customers that finally do find our National website HONEYBAKED.com, they are forced to choose a state prior to being allowed to SHOP ONLINE.

As an expert we spoke to explained, a user's first thought when visiting a website is typically "what is the threat to me," after which they consider "what is the benefit to me."  When a shopper is asked "In what state do you Live?" at the beginning of the shopping process, it is

likely to induce an anxiety.  The consumer may fear that how they answer the state question could affect their pricing or selection of products (which of course it does).  Users want access to the widest selection of products at the best prices.  Why are you asking me this irrelevant question?  Other websites don't require that?  Are you trying to rip me off?  That unfortunately is a reaction, some consumer's experience.  As a consumer, there should be no need to tell a website where I live until I am ready to complete the purchase. Asking up front is off-putting and lacks consumer expectation for transparency in Web processing.

Every added step in the process results in consumers dropping out of the conversion funnel on the way to a potential purchase.

The unconventional structure of our National website has begun to manifest itself in other disturbing ways.  Advertising and the use of online platforms have become increasingly important to reaching consumers on the Web.   One growing in importance is Google Shopping.  An increasing number of customers start their online search there to learn about or purchase a desired product.  We cannot even list our products on Google's shopping site because we do not have a shopping cart function associated with our only indexed site, HONEYBAKED.com.  As a result, when consumers enter the words Honey Baked Ham, they are offered every other brand of spiral sliced ham except our brand on this major platform.  Companies like Amazon cross reference with Google and others to display their products so the damage is multiplied. The result is, competitors take advantage of the limitation of our self-imposed Web structure to traffic on our good name.

Given the experience we had before the days of the Internet in defeating challenges that our brand is a generic word, we are very concerned when our brand is being linked with competing products in our category.  A substantial part of our legal spend each year goes to Trademark enforcement.  We have reason to believe the problem of brand confusion is getting worse and the Web is a significant factor.

A proper design for a website is to display product available for immediate purchase on the home page of the site, with prominence given to the most popular products.   Purchase ready capability also allows us to advertise on the Web and dominate the key words associated with our products.   We have never been able to compete on the Web through these tools due to the lack of one click purchase capability.

As I am sure you can appreciate, we have tried for a long time to mitigate this damage.  We spend money on paid searches, available to us on a limited basis due to our structure, but that only works to drive traffic to our splash page where we start losing credibility as traffic falls out of the funnel.   All of this results in a uniquely inefficient business model, relative to competitors with respect to attaining new customers and new purchases under the Brand.  Our web design needs to center on allowing the customer to complete their task as quickly and easily as possible, with the minimum amount of friction.

This impacts all channels of our business.  In today's world 60—75% of Web consumers shopping Retailers that have modern omni-channel capability, choose to pick up their products at retail bricks and mortar stores.  Our current structure makes it impossible for us to leverage this powerful modern marketplace, to drive consumer purchases across ALL fulfillment channels.

As we discussed, I have concluded that the only way effectively to address this problem with our website is to eliminate the requirement that forces customers to "Select the State in which You Live", and to establish a fully functional online store (in the vernacular of our license agreement "a mail order house"), using HONEYBAKED.com.   This change allows us to; advertise on a nationwide basis, get credit for the huge level of purchase traffic that algorithms use to value websites, allow us to index high on relevant and owned words, leverage the full consumer traffic on the World Wide Web for new consumers and purchases, and finally to clear the Web of brand confusion created by the our current construct.

We will implement these changes on August 11, 2019.

As previously discussed, you may continue to engage in mail order transactions and to solicit business with in the state of California using a domain name uniquely associated with your online store.   We will however begin to fulfill all orders for online purchases that come through a purchase ready HONEYBAKED.com.

Clearly, this will impact the volume of orders coming to your California website.  I propose the following solution:

1) In order to mitigate the loss of sales to you, we will be sending you our current database containing 38,890 distinct "Bill To" Customer's from California dating back to 2016 that have been developed from Honeybakedonline.com (and our sister companies prior to consolidation). This should significantly mitigate the loss from orders you currently receive from HoneyBaked.com.   We will send you our current California "Bill To" customer list well ahead of the holiday season for your direct solicitation.   Our success rate on direct solicitation from prior purchasing customers is extremely high.  In fact direct solicitation, by email address or mailing address, drives nearly half of our mail order business, as I am sure it does for you.

2) After fulfilling the initial order, on an ongoing basis, we will send you all incoming California "Bill To" addresses and the associated data that come to us through HONEYBAKED.com.   We will send you the data on a monthly basis so that you can then solicit customers to shop directly on your domain name.  We are confident that with a fully functional HBH home page on the Web, we will be able to send you a higher volume of new customers to grow your business.

3) We will continue to direct consumers that choose the 'Store Locater' option directly to your website via the store locator on our website.  Fully half of HONEYBAKED.com

consumers today go either to the Store Locator or to the non-shopping options (recipes etc.) on the website.

I understand this is represents a change in the way we have conducted our mail order businesses in the past.  We have carefully reviewed the license agreement with you and we believe we have the right to make this change.  I recognize that you may read your contract differently. The bottom line is that I want to resolve this issue with you by an agreement that allows the HBH system collectively, to leverage the Web to grow our mutual interests for the long term, without sacrificing the health of our brand.

Looking ahead, if you are willing to participate, we would prefer to work with you to connect our fulfillment channels so that you can directly fulfill orders that come through the national website for Recipient Customers that reside in California from your Anaheim facility. This would ultimately be the best way to serve customers both qualitatively and from a cost perspective.  Unfortunately, using Anaheim to fulfill orders that come through a central purchase point on the national website, requires investment and effort on both our parts to align on SKU's, pricing and to provide the technology required for inventory visibility.

While I am hopeful that we can move to the recipient based fulfillment model in the coming years, the August 11th change allows us to take the critical first step in opening up the Web in sourcing new consumers and purchases across ALL channels of our business. It also prepares us for the modern retail requirement of providing consumers with Omni channel options for fulfillment.

I know there is a lot in this letter for you to consider.  I look forward to discussing it with you again soon.

Sincerely,

Linda van Rees
CEO

EXHIBIT C



July 30, 2019

Mr. Richard Gore
HoneyBaked Ham, Inc.
29 Musick St.
Irvine, CA 92618

Richard,

Enclosed is the financial summary that our folks did on the impact of the web change for you. We obviously do not have complete data for Anaheim/Ecom business so we have estimated on a few items like your Gross Revenue (based on our royalty reports), and operating profit margin (6%). On the margin, we assumed you were more profitable than we are. As I told you, this year we saw a 3% operating margin, last year 1%. From research we have done we believe that 6% is relatively common in the industry.

In the model attached we show the impact of the new method of sending California traffic to you from the web starting August 11th, and how we believe that impacts your financials. In the new model, we send you all California "Bill To" customer data after fulfilling the initial order that comes in through Honeybaked.com. You can then solicit those customers directly for future sales. We have found that direct solicitation of existing "Bill To" customers results in 40% successful repurchase rate. We show your current base sales (estimated from 2019 royalty reports from Anaheim), minus the traffic you would normally receive from the web through the sort mechanism currently in place (Referral Traffic) plus the impact of new traffic we will send you of California "Bill To" Customers on an ongoing basis.

Obviously, the primary way initially that we believe we will offset the loss of immediate referral through the forced sorting of the consumer on Honeybaked.com, is by providing to you the 38,890 California "Bill To" Customers from our current data base. In addition to the initial 38,890 customers, we will be sending to you on an ongoing basis the new California "Bill To" customers we hope to source by taking a more aggressive presence on the web under our Trademarks. We will be sorting OUT California "Bill To" customers in our future outbound solicitation efforts so that you will have that opportunity to yourself.

We calculated the traffic statistics that came through the web in 2019 from California, and estimated the value of that traffic based on OUR success rate in converting traffic to *purchases*. We modeled this impact precisely the way we model our own business for forecasting and planning purposes. That's all we know how to do. While the information of course is our

best estimate, we think it should be relatively accurate as it relies on prior response rates and traffic counts.

Of course there is the possibility our modeling is not as accurate as we would hope.  There is much volatility in our web metrics right now so there are MANY potential factors that are not taken into account here, simply because we just don't know how to calculate the impact.  For example, the traffic to California website was certainly higher in the last two years due HBH LLC running out of hams and turkeys two weeks prior to the holiday.  The fact that we ran out of product causes volatility in projections for both you all and HBH LLC this coming year, that we have no way to measure.

The biggest unknown is that we will be advertising for the first time in the history of the company with the full capacity of the World Wide Web to connect consumers and our Brand. It is impossible to know what that will mean.  It could drive huge volume or it could be very modest.  We just don't know, as we have never done it before.

We expect to connect with an entirely NEW group of customers\purchases by enabling HBH to function properly on the web for the first time in our history.  We believe this will drive growth over time that is not currently accessible for either of us in our current construct.  If however, sales are not all we had hoped, we still will consider this a huge success if we can stop competitors from trading off our name and allow us to get proper credit under our Trademarks. We will be spending significant marketing dollars on behalf of the entire HBH system, for the first time, on creating a presence on Google Shop and on purchasing key words among other things.   That spending should add up to lots of opportunity for new customers and new purchases under the HBH Trademarks.

I know this is a leap of faith for you all.  Please review the material and let me know if I can answer any additional questions.  You are better equipped to forecast your business since you have real data, but I thought it would be helpful for you to see how we forecast.
In any case what I will tell you is that next year, you and I can sit down and review what ACTUALLY happened and I commit to you to work with you to do what needs to be done to ensure you all are made whole, and make you feel good about where we landed.  This change should ultimately help everyone operating under our Trademarks.

It would be helpful at some point if you could let me know the capacity at Anaheim.  I am under the impression based on numerous discussions with you that you all are at the current time, very close to being at full capacity.

Perhaps next year we can talk about what you believe you can handle there.  I would be happy to find a way to get you as many western orders as you feel you can manage through Anaheim, perhaps trading west orders for east orders in part so that you all can see better margins AND fill your capacity.   As I have told you many times, there is plenty of western volume to fill your

facility.   I would love to work with you to improve margins, customer service and quality by using your western facility to accommodate as much volume as you feel you can manage.

We are ready when you are to upload 38,890 California "Bill To" Customers from our customer files to an FTP file for you to access so you can begin soliciting them immediately.   We will also use that file on an ongoing basis to upload new customer data as it comes in.  Due to data security requirements we need to use the file as a 'transfer' mechanism.  Once you have retrieved the data into your secure system, we will remove all data from the FTP file.   Unless you tell me otherwise, we will send YOU, the information to access the data file, including a password for you to access the file.   If you would rather we send data to someone else, let me know.

Call me if you have any further questions,

Linda van Rees
CEO

Attachment (1)