P. Kurt Peterson (State Bar No. 067123)
K. Nina Reynolds (State Bar No. 206802)
PETERSON MARTIN & REYNOLDS, LLP
299 Third Street, Suite 200
Oakland, California 94607
(415) 399-2900
(415) 399-2930 facsimile
kpeterson@pmrlegal.com

Attorneys for Plaintiff,
HONEY BAKED HAM INC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| HONEY BAKED HAM INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>Honey Baked Ham Company LLC, a Delaware limited liability company, HBH Licensing, LLC, a Georgia limited liability company,<br><br>Defendants. | Case No. :19-cv-01528-JVS (DFMx)<br><br>[PROPOSED] FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF<br><br>Judge: Hon. James V. Selna<br>Courtroom: 10C<br>411 West 4th Street<br>Santa Ana, CA 92701<br>Date: n/a<br>Time: n/a<br><br>Complaint filed: August 7, 2019 |

Plaintiff HONEY BAKED HAM INC. ("HBH California" or "Plaintiff") hereby complains against HONEY BAKED HAM COMPANY LLC ("HBH USA"), and HBH Licensing, LLC ("HBH Licensing") as follows:

## NATURE OF ACTION

1. Plaintiff is a licensee and franchisee of the Honey Baked Ham brand (the "HBH Brand" or "Brand"). Plaintiff has been the exclusive HBH Brand licensee and master franchisee for the State of California for over 30 years.

2. Under the express terms of its license agreement, Plaintiff has (among other things) the exclusive right to operate (or license others to operate) retail stores using the HBH Brand in California, and exclusive right to offer, complete, and fulfill

-1-

"mail order" (including online) sales of HBH Brand products in the State of California. Pursuant to the express terms of Plaintiff's license agreement no other person has any right to solicit, take, or fulfill online orders of these products to customers in the State of California.

3. This case is about HBH Licensing's breach of Plaintiff's license agreement by undermining Plaintiff's right to engage in online sales and by allowing violations of Plaintiff's exclusive territory. In short, HBH Licensing has:

- breached its express contractual obligations to operate an orderly system for online transactions "for the benefit of the entire HoneyBaked system" and to "not undermine Licensee's fundamental right to engage in" online sales;
- breached its implied covenant of good faith and fair dealing by depriving Plaintiff of the benefits of its license agreement.

4. This case is also about HBH USA's attempts as an online vendor of HBH Brand products to decrease competition and increase prices for HBH Brand goods by seeking to drive Plaintiff out of the online business for HBH Brand products in California through unlawful interference with competition and unlawful interference with Plaintiff's supply of goods. In short, HBH USA has:

- acted in concert with its website and digital marketing developer to evade this Court's order intended to require that HBH USA respect Plaintiff's exclusive territorial rights, and to clandestinely prevent online customers from reaching Plaintiff; and,
- acted in concert with product suppliers to choke off Plaintiff's product supply in order to impair Plaintiff's ability to sell online.

PARTIES

5. Plaintiff, HBH California, is a California corporation whose principal place of business is in Irvine, California.

6. Defendant HBH USA is a Delaware limited liability company with its principal place of business at 3875 Mansell Road, Alpharetta, Georgia 30022.

7. Defendant HBH Licensing is a Georgia limited liability company with its principal place of business at the same address as HBH USA. HBH Licensing is a wholly owned subsidiary of HBH USA, shares office space with HBH USA, and shares management with HBH USA.

## JURISDICTION AND VENUE

8. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiff is a California citizen; defendant HBH USA is a Delaware limited liability company with its principal place of business in the State of Georgia; and, defendant HBH Licensing is a Georgia limited liability company with its principal place of business in the State of Georgia. Accordingly, complete diversity exists between plaintiff and defendants.

9. The value of the relief Plaintiff seeks, including attorneys' fees and costs, exceeds the jurisdictional threshold of $75,000.

10. This Court has personal jurisdiction over defendant HBH USA because it is registered to do business in California with the California Secretary of State, and because HBH USA has sufficient continuous and systematic minimum contacts with California such that it foresaw the possibility of being sued in this state, including conducting significant business activities in this state and engaging in sales, and efforts to make sales, to customers located in California in violation of Plaintiff's contractually granted exclusive territory.

11. This Court has personal jurisdiction over defendant HBH Licensing because the License Agreement between Plaintiff and HBH Licensing concerns the California market and is to be performed substantially in California.

12. Venue is proper in this district because a substantial part of the events occurred in this District and concern an order made by this Court.

## FACTUAL BACKGROUND

I. Brief History of the Honey Baked Ham Brand and Online Distribution

13. The Honey Baked Ham brand dates from 1957, when founder Harry J.

1  Hoenselaar obtained a patent covering his spiral ham slicing machine and opened the
2  first Honey Baked Ham store in Detroit, Michigan.  Since then the Brand has expanded
3  and is now distributed nationwide and in select foreign countries via retail stores and
4  online sales.

5      14.    As the Brand expanded nationwide, the distribution of HBH Branded
6  products was divided among six parties.  Four of those parties were the founder's
7  children, who each operated separate entities that had exclusive rights to sell HBH
8  Brand products in their own, separate geographic regions within the United States.
9  The fifth party, not relevant to this matter, had the rights to distribute products bearing
10 the HBH Brand in Oregon, and was ultimately bought out by one of the founder's
11 descendants.

12      15.    The sixth party, plaintiff HBH California (directly and through a
13 predecessor), was granted a series of exclusive licenses to operate stores operating
14 under the HBH Brand in California, and to offer, sell, and fulfill mail-order—including
15 online—transactions for the delivery of products bearing the HBH Brand in California.
16 Pursuant to its exclusive licenses, for over three decades HBH California has invested
17 in developing brand awareness and sales within its California territory, with great
18 success.

19      16.    In or about February 1988, ownership of the HBH Brand and related
20 assets were transferred to a Michigan limited partnership called HBH Limited
21 Partnership.  HBH Limited Partnership became the licensor to the four family regional
22 licensees and to Plaintiff, HBH California.

23      17.    Initially, each of the licensees of the HBH Brand distributed printed paper
24 catalogs to promote the sales of products by mail order.  With the growth of the
25 Internet and online sales, HBH California and the four family regional licensees each
26 developed online shopping sites for sale of HBH Brand and associated products online.

27      18.    Because of the conflict between the universal accessibility of the Internet,
28 and the exclusive territorial rights granted to each regional licensee, HBH Limited

1  Partnership developed an umbrella website at www.honeybaked.com (the "National
2  Website") to act as a gateway for all online shopping inquiries for HBH Brand
3  products. The National Website included a state selector that redirected customers to
4  the appropriate regional online sales site. For example, a customer visiting the
5  National Website who selected "California" in the state selector would be
6  automatically referred, or "redirected," to HBH California's shopping website. The
7  National Website performed only this redirection function; HBH Limited Partnership
8  did not make any retail sales itself.

9      19.    In conjunction with development of the National Website, HBH Limited
10 Partnership required that its licensees include "noindex" instructions in their individual
11 websites to prevent Internet search engines from listing the individual websites in
12 search results.

13     20.    In defendant HBH USA's own words, the purpose of this system was to
14 have the National Website act "as a sorting mechanism to direct consumers to [the]
15 non-indexed [shopping] sites to purchase our product. This prevents us from operating
16 competitively on the web." In other words, the National Website acted as a
17 mechanism for complying with the exclusive territorial licenses granted to each of the
18 four family regional licensees and to HBH California.

19     21.    As a result of this system approximately half of the traffic to HBH
20 California's website is referral traffic from the National Website.

21     22.    This system also allowed each online vendor of HBH Brand products to
22 promote and operate their separate businesses with a degree of flexibility and
23 autonomy.

24     23.    Moreover, this system allowed each online vendor to independently
25 manage its own pricing, orders, and inventory. This is a critical aspect of operation in
26 the market for products bearing the HBH Brand because of the lengthy production
27 process and the cyclical nature of the market. The high season for sale of Honey
28 Baked Ham products is the holiday period from shortly before Thanksgiving to just

after the new year, with historically smaller peaks around other holidays such as Easter. Because production of "big-ticket" items (i.e., half and whole hams ranging from six to sixteen pounds) can take months to complete, each entity selling HBH Brand products must analyze sales trends from prior years and other data to make forecasts about upcoming sales to order production of products and related supplies in advance. For example, at the time this action was originally filed in early August 2019, HBH California had already ordered the products it expected to sell during the peak 2019-2020 holiday season.

II. Plaintiff's License Agreement

24. On or about April 23, 2015, Plaintiff entered into its current exclusive license for the California market with HBH Limited Partnership as licensor. A true copy of this license (the "License Agreement") is attached as Exhibit A.

25. Among other things, this License Agreement establishes that Plaintiff's right to sell to California customers is exclusive:

- Section 2(a) of the License Agreement states, "Licensor hereby grants to Licensee the exclusive right and license to use the Proprietary Marks and the system to (i) promote and operate the HoneyBaked Outlets within the Territory, (ii) market and sell Branded Products and Non-Branded Products through HoneyBaked Outlets within the Territory to consumers for on-premises or off-premises consumption, and (iii) [conduct] Mail Order Transactions, to the extent permitted by Section 6(b)(xi)." Ex. A, § 2(a).
- HBH California's "Territory" is defined as "the entire State of California." Ex. A, § 1(d).
- "Mail Order Transactions" are defined to include orders placed through "online catalogs accessible on Internet websites associated with domain names the use of which has been approved by Licensor." Ex. A, § 1(g).
- Section 6(b)(xi) of the License Agreement states, as relevant here, that "Licensee may sell Branded Product and Non-Branded Products in the

    Territory through Mail Order Transactions" provided it complies with law, uses appropriate packaging, and does not solicit orders outside California. Ex. A, § 6(b)(xi).

The exclusive right to sell online in California was specifically negotiated by Plaintiff, and Plaintiff would not have entered into the 2015 License Agreement without that right.

  26. Plaintiff uses the domain name shophoneybaked.com for its online sales. That domain name was approved long ago by HBH Limited Partnership. Plaintiff has used that domain name continuously without objection from HBH Limited Partnership, HBH Licensing, or HBH USA, and Plaintiff's online sales have at all times been in substantial, if not absolute, compliance with the requirements of section 6(b)(xi) of the License Agreement.

  27. The License Agreement also requires that "Licensor shall operate and maintain a National Website to promote the Branded Products and the Proprietary Marks …," Ex. A, § 6(c)(iv), that "Licensor must administer an orderly system for Mail Order Transactions for the benefit of the entire HoneyBaked system," and "that the system shall not undermine Licensee's fundamental right to engage in Mail Order Transactions …." Ex. A, § 6(b)(xi).

### III. Consolidation of Family Ownership

  28. On or about March 20, 2015, HBH USA was formed in anticipation of the consolidation described in the next paragraph. On or about April 24, 2015, HBH Licensing was formed in anticipation of the consolidation described in the next paragraph.

  29. Plaintiff is informed and believes that on or about May 4, 2015, defendant HBH USA acquired all of the assets of HBH Limited Partnership and the four family regional licensees, except certain rights under Plaintiff's License Agreement, which were transferred to HBH Licensing. As a result of these acquisitions, HBH USA became the owner of the HBH Brand and all associated trademarks and trade dress and

other intellectual property, began to operate the National Website as agent for or alter ego of HBH Licensing, and became the only online vendor other than Plaintiff of HBH Brand products.

30. Plaintiff is also informed and believes that on or about May 4, 2015, defendant HBH Licensing acquired some of HBH Limited Partnership's rights (the exact extent of which Plaintiff has yet to ascertain) under plaintiff's License Agreement, and is now entitled to receive all payments from Plaintiff due under the License Agreement.

31. Notwithstanding this consolidation and reorganization, because HBH USA's acquisition of assets was subject to the rights previously granted to plaintiff in the License Agreement, plaintiff remains the only person with the legal right to offer, sell, and fulfill online transactions of HBH Brand products in California.

IV. HBH USA's Efforts to Infringe on HBH California's Exclusive Territory

32. Some time on or after May 4, 2015, HBH USA combined the former family regional online shopping websites into a single site at the domain honeybakedonline.com.  Then, some time before July 22, 2019, HBH USA began working with a website design and marketing company, Proving Ground LLC, dba Dragon Army ("Dragon Army"), to redesign its online shopping website and its online marketing and sales strategies.

33. Beginning in or around December 2018, HBH USA, acting either as HBH Licensing's agent or alter ego, began what has become a sustained effort by defendants to strip plaintiff of the right to sell online.  First, HBH USA threatened Plaintiff that it would have to shut down its online sales because it was violating federal Department of Agriculture requirements.  In fact, no such violation existed.

34. Next, HBH USA proposed that Plaintiff agree to HBH USA offering products on the National Website before customers were presented with the state selector, effectively asking plaintiff to give up its exclusive right to sell online in California.  Plaintiff declined.

35. Meanwhile, Plaintiff is informed and believes that HBH USA was working with Dragon Army on the design of a new website architecture for the National Website which, in general terms, replaced the existing gateway National Website with a home page for HBH USA only at the honeybaked.com domain, with links to various "sub-domains" through which HBH USA would make sales of HBH Brand products.

36. On July 22 and 30, 2019, HBH USA sent letters to Plaintiff notifying Plaintiff that effective August 11, 2019, it would unilaterally remove the state selector mechanism from the National Website and that it would begin soliciting, taking, and fulfilling <u>all</u> online orders for products identified by the HBH Brand, including orders for delivery in California. True copies of these letters are attached as Exhibits B and C, respectively.

37. HBH USA expressly admitted in its letters that this change would "impact the volume of orders coming to [Plaintiff's] California website," would result in a loss of sales to HBH California, Ex. B at 3, and that "we just don't know how to calculate the impact," Ex. C at 2.

38. Meanwhile, HBH Licensing and HBH USA continued to require that HBH California not index its shopping website—in other words, that HBH California's website remain invisible to anyone searching for HBH Brand products on the Internet.

39. In its July 30, 2019, letter, despite having stated that it intended to misappropriate all of HBH California's online business, HBH USA acknowledged that in the prior two years it had been unable to meet its own customer demand outside California "due [to HBH USA] running out of hams and turkeys two weeks prior to the holiday." Ex. C at 2.

40. Nonetheless, HBH USA stated its intent to proceed without regard to the effect its actions would have on HBH California's business, effectively thumbing its nose at HBH California's preexisting exclusive rights under the License Agreement.

V. This Litigation to Date

41. HBH California filed this action on August 7, 2019, seeking temporary, preliminary, and permanent injunctive relief preventing HBH USA from violating HBH California's exclusive rights to the California market under the License Agreement.

42. This Court initially granted a temporary restraining order prohibiting HBH USA from removing the state selector from the National Website. It subsequently replaced that order with an order to the effect that HBH USA maintain the National Website in its then-current form unless and until it implemented a fail-safe system such that there was a seamless transition ensuring that, at all times, California customers were routed to HBH California's website. The Court required HBH USA to submit monthly status reports regarding its progress toward that end.

43. In its "March 2020 Website Transition Status Report" HBH USA advised the Court that on February 13, 2020, it had merged its shopping website with its national website and deployed a new and improved state selector. It represented to the Court that the merged website and state selector "function as intended and preserve Honey Baked California's right to an exclusive license in California."

44. On or about February 13, 2020, HBH USA began operating the new National Website at honeybaked.com, including a new subdomain for sales of HBH Brand food products at shipping.honeybaked.com. HBH USA has also added other subdomains, including for sale of HBH Brand non-food products.

VI. Defendants' Evasion of This Court's Order

45. Both honeybaked.com and shipping.honeybaked.com include a state selector. As of the filing of this amended complaint, in effect (if not in precise technical detail) that state selector mechanism functions in two primary ways.

46. First, if the state selector does not detect a pre-existing cookie from the shipping.honeybaked.com site, it presents the user with a pop-up (sometimes referred to by the technical term "modal") that asks the user to select their state of residence. If

the user selects California the state selector places a cookie on the user's computer containing the code "CA" and redirects the user to plaintiff HBH California's shopping website at shophoneybaked.com. For any other state selection the state selector places a cookie on the user's computer containing the code "USA" and redirects the user to HBH USA's shopping website at shopping.honeybaked.com.

47. Second, if the state selector mechanism <u>does</u> detect a pre-existing cookie on the user's computer, it does not display the pop-up but simply redirects the user either to HBH California's shopping website or to HBH USA's shopping website according to whether the cookie reads "CA" or "USA."

48. HBH USA is able to modify the behavior of the state selector at any time, without notice to HBH California and without HBH California necessarily being aware of any change.

49. Moreover, subsequent to making its new website "live" on February 13, 2020, and at least as early as February 18, 2020—i.e., well before HBH USA filed its "March 2020 Website Transition Status Report"—HBH USA and Dragon Army continued the campaign to deprive Plaintiff of its sole rights to make online sales in California by implementing a scheme to bypass the state selector altogether under certain circumstances.

50. First, they prepared and distributed digital advertisements via web search engine results, social media pages, and email campaigns, that included direct links to shipping.honeybaked.com ("End-Run Links"). Those links included parameters that effected an end-run around the state selector, such that a customer clicking one of those links would never see the state selector but would be taken directly to HBH USA's shopping site at shipping.honeybaked.com, whether they had ever visited the National Website before, and <u>even if they had previously visited the National Website and had selected California in the state selector</u>.

51. Second, the End-Run Links caused HBH USA's shopping website to place a cookie on the customer's computer with the code "USA." Thus, a consumer

-11-

clicking on such a link never had the opportunity to select HBH California, and unknowingly "became" an "HBH USA customer."

52. Third, in the case of a customer with a pre-existing cookie reading "CA," the End-Run Links caused HBH USA's website to <u>overwrite</u> the existing "CA" cookie with a new "USA" cookie. Thus, by clicking on one of these links an existing customer of HBH California "became" a customer of HBH USA without ever knowing it and, because of the state selector behavior, without ever again being presented with an opportunity to choose to shop at HBH California's site.

53. Plaintiff is informed and believes that HBH USA and Dragon Army have acted in concert to design and implement additional strategies to deprive HBH California of online customers, including placing similar links (that also made an end-run around the state selector) on social media sites such as Facebook, all the while denying Plaintiff approval to maintain social media sites of its own.

54. More specifically, HBH USA, as agent for or alter ego of HBH Licensing, has forbidden Plaintiff from maintaining social media accounts, such as on Facebook, Instagram, and Twitter, without its pre-approval, but has refused to provide approval without providing any explanation, let alone justification.

55. Meanwhile, HBH Licensing and HBH USA have been failing to provide Plaintiff with timely information about posts made by customers of HBH California on the national social media accounts maintained by HBH USA, as well as on the National Website, thereby preventing Plaintiff from promptly addressing any legitimate complaints about online orders and deliveries in California and allowing unjustified and damaging negative posts to remain online and to be shared without Plaintiff having any timely opportunity to address them.

56. HBH USA has also used complaints on social media as an excuse for demanding that Plaintiff not use certain shippers that provide deliveries of products ordered online from Plaintiff at commercially viable rates, even though neither HBH USA nor HBH Licensing has any right to control what shippers Plaintiff uses. For

1  Plaintiff to comply with this demand means either that Plaintiff must absorb significant
2  shipping costs or that it can no longer offer shipment of online orders at the same
3  effective prices as HBH USA, let alone at the generally significantly lower prices that
4  HBH USA has historically offered.

5      VII.    <u>HBH USA's Attempts to Obstruct Plaintiff's Supply</u>

6          57.    Since Plaintiff first became a licensee of the HBH Brand, it has been
7  required to purchase hams, turkey breasts, and certain other products it sells that are
8  identified by the HBH Brand from "Selected Suppliers" approved by its licensor.
9  However, under its license agreements for the HBH Brand, including its current
10 License Agreement, Plaintiff has always been free to communicate with and to order
11 independently from the Selected Suppliers.  Plaintiff has never been contractually
12 required to seek approval from HBH Limited Partnership, HBH Licensing, or HBH
13 USA, for its communications or orders from Selected Suppliers, nor has it historically
14 done so.  Plaintiff is informed and believes that, likewise, the Selected Suppliers have
15 always been free to communicate with and supply Plaintiff independently, without
16 need to seek approval from HBH Limited Partnership, HBH Licensing, or HBH USA,
17 and that they have historically done so.

18         58.    Two of the Selected Suppliers identified in the License Agreement are
19 Fresh Mark, Inc. ("Fresh Mark") and Tyson Foods, Inc. ("Tyson").

20         59.    On or about April 21, 2020, Plaintiff contacted Tyson to order product.
21 Initially, Tyson told Plaintiff that it had 600 cases of product available that it could
22 ship to plaintiff immediately.  Plaintiff told Tyson it wanted to order all of that product
23 and requested payment instructions.  Within a day, however, HBH USA, again acting
24 as agent or alter ego of HBH Licensing, told Plaintiff: "We have been informed by
25 Tyson that you have reached out directly to them about possibly purchasing
26 product.  If you want to purchase from Tyson, we need to make the introduction to
27 Tyson through our channels.  We do not believe Tyson has product at this time but we
28 can make the introduction."  Subsequently Tyson told Plaintiff that all but 30 cases of

1  its available product had already been "spoken for" and that it was unable to supply
2  Plaintiff with any.  (Meanwhile, HBH USA has yet to "make the introduction"
3  between Plaintiff and Tyson that it claims is required.)
4        60.    At HBH USA's instruction, Plaintiff then contacted Fresh Mark to order
5  product.  Fresh Mark told Plaintiff that it had only a limited amount of sliced ham
6  product available, and that the remainder of its available product was unsliced.  Pre-
7  sliced hams are an integral part of the HBH Brand product line, and feature
8  prominently in HBH Brand marketing.  Even though purchase of unsliced hams would
9  have required Plaintiff to restart a slicing operation that it has not conducted in years,
10 Plaintiff was willing to purchase both the sliced and unsliced product from Fresh Mark
11 and asked HBH USA for confirmation that there was no objection to it restarting its
12 own slicing operations.  HBH USA never responded.

## FIRST CLAIM FOR RELIEF
## ANTICIPATORY BREACH OF CONTRACT
### (against HBH LICENSING and HBH USA)

17        61.    Plaintiff incorporates the allegations of paragraphs 1-60.
18        62.    Plaintiff has performed all obligations required of it under the License
19 Agreement other than obligations as to which performance was excused.
20        63.    As set forth in sections 2 and 6(b)(xi) of plaintiff's License Agreement,
21 attached hereto as Exhibit A, Plaintiff has the exclusive right and license to use the
22 Honey Baked Ham trademarks and trade dress not only to promote, operate, and sell
23 HBH Brand products through retail stores in California, but also to fulfill orders
24 requiring shipment of HBH Brand food to customers in California, including online
25 orders.  Section 6(b)(xi) of the License Agreement expressly acknowledges that
26 Plaintiff's right to engage in online transactions in California is a "fundamental right"
27 which the licensor "shall not undermine."
28        64.    As alleged above, in July 2019, HBH USA stated to Plaintiff that it

-14-

intended to remove the state selector mechanism from the National Website and to take for itself all online sales of HBH Brand products in California, in violation of the exclusive rights granted to Plaintiff in the License Agreement.

65. As a result of Plaintiff filing this lawsuit and this Court's orders, HBH USA undertook to implement a "fail safe" state selector mechanism to assure that all existing and future customers of Plaintiff would be directed exclusively to Plaintiff's website for purchases. As alleged above, HBH USA has already taken (and continues to take) steps to make an "end run" around the state selector.

66. HBH USA has at all times acted as agent for or alter ego of HBH Licensing with regard to the administration, operation, and redesign of the National Website and the state selector mechanism.

67. These threatened changes to the operation of the National Website will have devastating effects on Plaintiff's online sales. As explained above, HBH California's online store depends heavily on the National Website to capture potential customers. By eliminating the mechanism by which California customers of HBH Brand products are directed to Plaintiff, and because HBH California's website is—at HBH Limited Partnership's, and then HBH Licensing's and HBH USA's insistence— not indexed, and therefore cannot be found using standard internet searches, this threatened course of action by HBH Licensing and HBH USA would effectively eliminate HBH California from the online market and allow HBH USA to misappropriate that entire market for itself.

68. HBH Licensing, through HBH USA, will proceed with these violations of Plaintiff's exclusive right to make online sales of HBH Brand products in California if HBH Licensing and HBH USA are not enjoined from doing so.

69. Further, HBH Licensing, through HBH USA, has made clear by its conduct that it intends to breach its contractual responsibility to "administer an orderly system for Mail Order Transactions for the benefit of the entire HoneyBaked system."

70. HBH Licensing's and HBH USA's threatened acts will constitute a breach

of their express contractual obligation to "not undermine [plaintiff's fundamental right to engage in" online sales in California.

Wherefore, Plaintiff prays relief as set forth below.

## SECOND CLAIM FOR RELIEF
## BREACH OF CONTRACT
## (against HBH LICENSING and HBH USA)

71. Plaintiff incorporates the allegations of paragraphs 1-60.

72. Plaintiff has performed all obligations required of it under the License Agreement other than obligations as to which performance was excused.

73. HBH USA has at all times acted as HBH Licensing's agent or alter ego with regard to administration, operation, and redesign of the National Website and the state selector mechanism.

74. As set forth in sections 2 and 6(b)(xi) of plaintiff's License Agreement, attached hereto as Exhibit A, Plaintiff has the exclusive right and license to use the Honey Baked Ham trademarks and trade dress not only to promote, operate, and sell HBH Brand products through retail stores in California, but also to fulfill orders requiring shipment of HBH Brand food to customers in California, including online orders.

75. Section 6(b)(xi) of the License Agreement expressly requires that "Licensor must administer an orderly system for Mail Order Transactions for the benefit of the entire HoneyBaked System" and that this system "shall not undermine Licensee's fundamental right to engage in Mail Order Transactions."

76. HBH Licensing and HBH USA have breached these express obligations of the License Agreement by failing to administer the National Website for the benefit of the entire HoneyBaked System (which includes Plaintiff HBH California), manipulating the National Website so as to favor HBH USA and disfavor HBH California, and engaging in deliberate evasion of this Court's existing order regarding the state selector mechanism.

-16-

Wherefore, Plaintiff prays relief as set forth below.

## THIRD CLAIM FOR RELIEF

## BREACH OF IMPLIED COVENANT

(Against HBH LICENSING and HBH USA)

77. Plaintiff incorporates the allegations of paragraphs 1-60.

78. Plaintiff has performed all obligations required of it under the License Agreement other than obligations as to which performance was excused.

79. HBH Licensing has at all times been aware of HBH USA's actions as its agent with regard to the National Website and the state selector mechanism, or HBH USA has acted, and continues to act, as HBH Licensing's alter ego with respect to administration and operation of the National Website.

80. A covenant of good faith and fair dealing is implied by law in the License Agreement. That implied covenant requires that HBH Licensing and HBH USA do nothing to prevent HBH California from enjoying the benefits of the License Agreement.

81. HBH Licensing and HBH USA as its alter ego, have breached this implied covenant of good faith and fair dealing by HBH USA's violations of Plaintiff's exclusive right to make online sales for delivery in California, and by HBH USA's attempts to prevent and/or actual prevention of Plaintiff from making online sales it is contractually entitled to make.

Wherefore, Plaintiff prays for relief as set forth below.

## FOURTH CLAIM FOR RELIEF

## UNFAIR COMPETITION

California Business & Professions Code § 17200 et seq.

(against HBH USA)

82. Plaintiff incorporates the allegations of paragraphs 1-60.

83. HBH USA's deceptive conduct significantly threatens and harms competition by:

- preventing customers who search for "honey baked ham" on the internet from finding HBH California's website in the first place (via the prohibition on search engine indexing of HBH California's website);
- secretly diverting customers away from Plaintiff's website through the use of End-Run Links, thereby
- depriving customers who click one of its End-Run Links of any opportunity to shop at the significantly lower prices that HBH California typically offers for equivalent products;
- restricting Plaintiff's supply of products to sell, thereby causing Plaintiff to incur higher product costs and driving up costs to consumers;
- depriving customers of the significantly lower prices that HBH California typically offers for equivalent products by purporting to bar HBH California from using low-cost shippers.

84. HBH USA's conduct constitutes unlawful, unfair, or fraudulent business acts or practices within the meaning of California Business & Professions Code sections 17200 et seq., and pursuant to Business & Professions Code section 17203 may be enjoined by this Court.

WHEREFORE, Plaintiff prays for relief against defendants as follows:

1. For a preliminary injunction against HBH Licensing and HBH USA prohibiting the conduct alleged in this amended complaint until the merits of Plaintiff's claims may be adjudicated;
2. For the issuance of a permanent injunction prohibiting defendants, or any of them, from engaging in any act to subvert the intent of the state selector mechanism;
3. For the issuance of a permanent injunction prohibiting HBH Licensing from allowing any person to violate Plaintiff's exclusive rights to sell HBH Brand products in California during the term of the License

Agreement;

4. Pursuant to Section 20(i) of the License Agreement, for an award of attorney's fees and costs on Plaintiff's contract claims against HBH Licensing;

5. For the issuance of a preliminary injunction against HBH USA on Plaintiff's unfair competition claim;

6. For the issuance of a permanent injunction against HBH USA on Plaintiff's unfair competition claim; and,

7. For such other and further relief as the Court may deem proper.

Dated: May 22, 2020                    PETERSON MARTIN & REYNOLDS LLP

By: /s/ P. Kurt Peterson

P. Kurt Peterson

Attorneys for Plaintiff, Honey Baked Ham Inc.

## JURY TRIAL DEMAND

Plaintiff hereby requests a jury trial for all issues so triable.

Dated: May 22, 2020                    PETERSON MARTIN & REYNOLDS LLP

By: /s/ P. Kurt Peterson

P. Kurt Peterson

Attorneys for Plaintiff, Honey Baked Ham Inc.